LYNCH, Circuit Judge.
John J. Connolly, Jr., the defendant in a highly publicized criminal trial, applied under the Criminal Justice Act (CJA), 18 U.S.C. § 3006A (2000), for government funding for a portion of his attorneys’ fees and legal expenses. Connolly had informed the court that he was already in debt to the counsel he had previously retained, and could no longer afford to pay his legal bills. He submitted financial affidavits and an additional document summarizing his total legal debt. The court granted him CJA assistance and, in response to his motions, placed the documents he had submitted under seal. After Connolly’s conviction, the Boston Herald, one of Boston’s two major daily newspapers, sought to intervene in the case and to unseal these financial documents, arguing *176 that it had a right of access to them under both the First Amendment and the common law. Connolly opposed. A magistrate judge allowed the intervention but denied the motion to unseal, and the district court affirmed. The Herald then filed both an interlocutory appeal and a petition for a writ of mandamus with this court.
No federal court of appeals, to our knowledge, has considered whether there is a right of access to the narrow category of documents at issue here: those submitted by a criminal defendant to show financial eligibility for CJA funds. We conclude that there is no right of access to this category of documents under either the First Amendment or the common law. Even if there were a common law presumption of access, there was no abuse of discretion in denying access here. We affirm the district court and deny mandamus.
I.
Connolly is a former FBI agent who was accused of impropriety in his relationships with informants, including alleged organized crime figures such as James “Whitey” Bulger and Stephen Flemmi. More detail about the earlier chapters of this saga can be found in United States v. Flemmi, 225 F.3d 78 (1st Cir.2000); United States v. Salemme, 91 F.Supp.2d 141 (D.Mass.1999); and United States v. Salemme, 978 F.Supp. 343 (D.Mass.1997). Information about Connolly’s relationships was extracted from a reluctant government by a persistent trial judge who heard the earlier criminal cases. Connolly’s prosecution and trial garnered extensive media coverage and public interest nationwide, especially in the Boston area, where he had been employed by the FBI. On May 28, 2002, Connolly was convicted of racketeering and obstruction of justice in the U.S. District Court for the District of Massachusetts. He has appealed his conviction, and that appeal remains pending separately.
At a pretrial hearing on March 5, 2002, Connolly’s attorney informed the district court that Connolly owed defense counsel substantial unpaid legal fees. The court noted that, with a trial in the complex case due to begin only two months later, substitution of counsel was not feasible. To avoid delay, the court raised the possibility that the attorney could be appointed and paid under the CJA if Connolly could demonstrate his eligibility. The CJA applies to “any person [who is] financially unable to obtain adequate representation.” 18 U.S.C. § 3006A(a).
Two days later, Connolly submitted an application for CJA assistance to the court’s Office of Pre-Trial Services. The application was referred to a magistrate judge, who appointed Connolly’s lawyer under the CJA in a written order on March 11, stating, “[I]t appears that although the defendant possesses a number of substantial assets, the total of these assets is less than half of his current liabilities.” Most of these liabilities, the order said, were legal bills that Connolly had already incurred. The order limited funding to cover only legal services provided after March 5, when counsel first informed the court of Connolly’s financial problems, and it recommended that the court reevaluate Connolly’s eligibility at the close of the cáse. The compensation rate for CJA-appointed counsel is significantly below the prevailing private rates for attorneys in Boston. As of May 1, 2002, shortly before Connolly’s trial began, it was $90 an hour, and before then it was $75 an hour for in-court work and $55 an hour for work performed outside court. There is a waivable maximum total of $5,200 per lawyer for a felony case. See 18 U.S.C.A. §§ 3006A(d)(2)-(3) (West Supp.2002).
*177 The magistrate judge also granted Connolly’s motions to seal three documents that he had submitted to demonstrate his CJA eligibility. The orders to seal these documents were issued without written findings; there was no objection to them at that time. Two of the three sealed documents are an original and an amended version of Connolly’s completed CJA Form 23 (the “CJA forms”), a standard “financial affidavit” signed under penalty of perjury. A blank copy of Form 23 is appended to this opinion. It requires comprehensive financial data, including employment income of the defendant and his or her spouse; all other income, cash, and property; identification of the defendant’s dependents; and all obligations, debts, and monthly bills. The third document, submitted in response to a question from the magistrate judge, states the total of Connolly’s outstanding legal fees from the date of his indictment, December 22, 1999, through February 28, 2002. The magistrate judge’s written order appointing Connolly’s lawyer under the CJA has always remained public.
On June 7, 2002, shortly after Connolly’s conviction, the Herald filed a motion to intervene and to vacate the orders sealing the three documents. Connolly opposed the motion. The district court referred the matter to the same magistrate judge, who allowed the Herald to intervene. In a written order of June 24, 2002 he denied the Herald’s motion to vacate the sealing order. United States v. Connolly, 206 F.Supp.2d 187, 188 (D.Mass.2002). On July 29, 2002, the district court overruled the Herald’s objections to the magistrate judge’s order.
II.
A. Appellate Jurisdiction
A federal court must satisfy itself of its jurisdiction over a case, even if all parties urge there is jurisdiction. See BIW Deceived v. Local S6, Indus. Union of Marine & Shipbuilding Workers, 132 F.3d 824, 828 (1st Cir.1997). To be sure of receiving prompt review, the Herald prudently made its request for access through two different procedural means, each raising the same substantive issues. On August 19, 2002, the Herald filed an interlocutory appeal from the district court’s July 29 order; on October 21, it filed a petition for a writ of mandamus. We ordered the two cases consolidated and received briefing and oral argument from the Herald and Connolly.
An appeals court may exercise its power of advisory mandamus under the All Writs Act, 28 U.S.C. § 1651 (2000), when, a petition “presents an issue of great importance and novelty, and one the resolution of which will likely aid other jurists, parties, and lawyers.” In re Justices of Superior Court Dep’t of Mass. Trial Court, 218 F.3d 11, 15 (1st Cir.2000). This court has found advisory type of mandamus power present in at least two cases arising from similar procedural settings, where media outlets challenged limitations placed on their access to a proceeding or document by a district court. See In re Providence Journal Co., 293 F.3d 1, 9 (1st Cir.2002); United States v. Hurley (In Re Globe Newspaper Co.), 920 F.2d 88, 90 (1st Cir. 1990). The conditions for mandamus review are similarly satisfied here.
The Herald also argues that we have jurisdiction over its interlocutory appeal under the collateral order doctrine. Cohen v. Beneficial Indus. Loan Carp., 337 U.S. 541, 546, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). This court recently left open the question of whether the doctrine applied in similar circumstances. See Provi *178 dence Journal, 293 F.3d at 9. We find that it applies here. The standards for jurisdiction over a collateral order are “separability, finality, urgency, and importance.” In re Cont’l Inv. Corp., 637 F.2d 1, 5 (1st Cir.1980). All of these conditions are met here: the dispute concerning the Herald’s access to documents is easily separated from the underlying criminal case; the order denying access disposes of the Herald’s claim of an access right with finality; the news value of the information would decline over time, lending the interlocutory appeal urgency, see Soto v. Romero-Barcelo (In re San Juan Star Co.), 662 F.2d 108, 113 (1st Cir.1981); and the Herald presents an important unsettled legal question. The order denying access is a collateral order, and we have jurisdiction over the interlocutory appeal as well as the mandamus petition.
B. The CJA and Disclosure
Before moving to the merits, we begin with some general context about the CJA and disclosure, which informs the analysis that follows.
The CJA provides for the government to pay for attorneys and related services at specified rates (usually well below market rates) on behalf of eligible criminal defendants. The statute applies to anyone who is “financially unable to obtain adequate representation.” 18 U.S.C. § 3006A(a). Guidelines promulgated by the Administrative Office of the United States Courts have elaborated slightly on this terse statutory definition, by saying that it applies to a defendant whose “net financial resources and income are insufficient to enable him to obtain qualified counsel” and that the court should consider “the cost of providing the person and his dependents with the necessities of life.” VII Admin. Office of U.S. Courts, Guide to Judiciary Policies and Procedures § 2.04 (2001) [hereinafter AO. Guide].[1] “Inability to pay is not the same as indigence or destitution.” Museitef v. United States, 131 F.3d 714 (8th Cir.1997); see 3A C.A. Wright, Federal Practice & Procedure § 732 (2d ed. 1982 & Supp.2002) (defining eligibility as defendant’s inability to “pay for adequate representation without substantial hardship to himself or his family”). The court may request further information or verification from the defendant or court officers, and the prosecution or other interested parties may also present relevant information to assist the court in its determination. See VII A.O. Guide § 2.03.
The magistrate judge here engaged in such further factfinding, by requesting and receiving the summary of Connolly’s legal bills. He then found that those prior legal bills and other liabilities were more than double Connolly’s assets, and that Connolly was eligible for appointment of counsel under the CJA. Although it is possible to provide retroactive reimbursement for legal bills incurred before the CJA application was submitted, see 18 U.S.C. § 3006A(b), the order explicitly allowed payments only for services provided after March 5, 2002.
The magistrate judge also recommended that the district court consider at the close of the case whether Connolly’s financial situation had improved. The CJA provides that “[wjhenever the United States magistrate judge or court finds that funds *179 are available for payment from or on behalf of a person furnished representation, it may authorize or direct” that the person reimburse the CJA funds expended on his or her legal defense. 18 U.S.C. § 3006A(f); see United States v. Merric, 166 F.3d 406, 411 (1st Cir.1999) (allowing reimbursement of CJA funds as condition of supervised release where defendant has means to pay); United States v. Fraza, 106 F.3d 1050, 1056 (1st Cir.1997) (citing United States v. Santarpio, 560 F.2d 448, 455 (1st Cir.1977)) (court must hold hearing when determining whether defendant now has means to reimburse CJA funds). The guidelines rely on this opportunity for reimbursement to recommend that, initially, “[a]ny doubts as to a person’s eligibility should be resolved in his favor; erroneous determinations of eligibility may be corrected at a later time.” VII AO. Guide § 2.04. Thus a decision to grant Connolly’s application before trial, and revisit the issue afterwards if there were doubts as to his eligibility, was an ordinary application of the relevant law and rules.
The statute itself is silent about disclosure of documents demonstrating a defendant’s financial eligibility for CJA status. The Act does require ex parte hearings for certain determinations, such as requests to fund expert services. See 18 U.S.C. § 3006A(e)(l); United States v. Abreu, 202 F.3d 386, 387, 389 (1st Cir.2000). Access to such requests may, of course, disclose defense strategy to the prosecution, and so do not involve the same interests as the issue before us. On the other hand, Congress added a new provision to the CJA in 1996 requiring disclosure of certain basic data about the amounts paid to lawyers under the Act, with specified exceptions. 18 U.S.C. § 3006A(d)(4); Pub.L. No. 104-132, § 903(a) (1996).[2] None of the three documents at issue here includes that type of data. The CJA forms contain only personal financial information about the Connolly family. The sealed statement of legal fees summarizes Connolly’s previous private legal bills, which were specifically excluded from CJA coverage. Nothing in the statute states whether these types of documents should be public.
The A.O. Guide sets out a general rule of disclosure and gives courts discretion to override it in particular cases:
Generally, such information which is not otherwise routinely available to the public should be made available....
Upon request, or upon the court’s own motion, documents pertaining to activities under the CJA and related statutes maintained in the clerk’s open files, which are generally available to the public, may be judicially placed under seal or otherwise safeguarded until after all judicial proceedings, including appeals, in the case are completed and for such time thereafter as the court deems appropriate.
VII A.O. Guide § 5.01(A) (2000). The guidelines specify situations that would justify departure from the general rule, including those where disclosure “could reasonably be expected to unduly intrude upon the privacy of attorneys or defendants.” Id.
The magistrate judge quoted these passages and weighed the competing interests involved. In the exercise of his discretion, he concluded that it was appropriate to seal the documents at issue here, because disclosure would “unduly intrude” on the *180 privacy of Connolly and his family. He ruled that they would be sealed at least until Connolly exhausted his appeals. We do not consider this order to be a summary dismissal. The magistrate judge weighed the factors with due consideration of the presumption of disclosure embodied in the A.O. Guide. The court thus weighed the public’s interest, which exists on both sides of this issue, as well as the defendant’s interest.
This description of the CJA process raises two important issues. First, it calls into question whether the CJA eligibility documents are judicial documents at all. “Not all documents filed with a court are considered ‘judicial documents.’ ” United States v. Gonzales, 150 F.3d 1246, 1255 (10th Cir.1998). Connolly argues that Congress could easily have delegated the task of determining a defendant’s eligibility for CJA aid to a non-judicial officer or to an executive agency. Indeed, states use many different structures to govern their indigent defense programs, some of which are housed within the executive branch and some of which are independent agencies. See generally R.L. Spangenberg & M.L. Beeman, Indigent Defense Systems in the United States, Law & Contemp. Probs., Winter 1995, at 31, 37-41.[3] Current practice under the CJA also delegates many responsibilities in determining eligibility to non-judicial officers. See VII A.O. Guide § 2.03(B) (allowing court to designate other court employees to “obtain or verify the facts upon which [the CJA eligibility] determination is to be made”). The forms used to apply for CJA assistance are generated by the Administrative Office, and Connolly filed them with the Office of Pre-Trial Services rather than with the clerk of the court or the judge. These facts support a conclusion that the CJA eligibility documents are not essentially judicial in character.
Both the constitutional and the common law rights of access have applied only to judicial documents. See El Dia, Inc. v. Hernandez Colon, 963 F.2d 488, 495 (1st Cir.1992) (discussing scope of First Amendment right of access and its limitation to judicial activities); Fed. Trade Comm’n v. Standard Fin. Mgmt. Corp., 830 F.2d 404, 408 (1st Cir.1987) (“Those documents which play no role in the adjudication process ... lie beyond reach” of common law presumption). There is no general constitutional right of access to information in the government’s possession. See Houchins v. KQED, Inc., 438 U.S. 1, 15, 98 S.Ct. 2588, 57 L.Ed.2d 553 (1978) (plurality opinion) (“Neither the First Amendment nor the Fourteenth Amendment mandates a right of access to government information or sources of information within the government’s control.”); Zemel v. Rush, 381 U.S. 1, 17, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965) (“The right to speak and publish does not carry with it the unrestrained right to gather information.”).
A determination that the CJA eligibility documents are not judicial documents would dispose of the Herald’s claims altogether. See M.A. Franklin, D.A. Anderson, & F.H. Cate, Mass Media Law 770 (6th ed. 2000) (“One question that *181 runs through many of these cases is whether the materials at issue are judicial records. If the court decides that they are not, there appears to be no right of access under either the common law or the First Amendment.”). While we think that these are not judicial documents, we hesitate to decide the issue here on that basis alone. Disentangling judges’ judicial and administrative roles can be tricky, as seen in other areas, such as absolute judicial immunity. See Forrester v. White, 484 U.S. 219, 227, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988) (“This Court has never undertaken to articulate a precise and general definition of the class of acts entitled to [judicial] immunity. The decided cases, however, suggest an intelligible distinction between judicial acts and administrative ... functions that judges may on occasion be assigned by law to perform.”); E. Chemerinsky, Federal Jurisdiction § 8.6 (3d ed. 1999) (“Although the distinction between a judicial function and an administrative one is often clear, there are many instances in which the characterization of the task is problematic.”). While we do not rely on this as the basis for our decision, we note that the administrative process of determining CJA eligibility is far removed from the core of the judicial function.
A second issue raised by this review is the distinction between the structure laid out in the AO. Guide and the blanket prohibitions found in many other cases concerning constitutional rights of access. Courts have disfavored blanket rules which failed to account for individual circumstances. The Supreme Court emphasized this point when it overturned, on constitutional grounds, a Massachusetts law which automatically required the closing of a trial when a victim under the age of eighteen testified concerning certain specified sexual offenses. Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 598, 602, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982). The Court there recognized that protecting a minor’s well-being was a compelling interest, but found that this interest “does not justify a mandatory closure rule, for it is clear that the circumstances of the particular case may affect the significance of the interest.” Id. at 608, 102 S.Ct. 2613; see also id. at 611, 102 S.Ct. 2613 (O’Connor, J., concurring) (“Massachusetts has demonstrated no interest weighty enough to justify application of its automatic bar to all cases, even those in which the victim, defendant, and prosecutor have no objection to an open trial.”). Similarly, this court has interpreted a federal law to authorize, but not require, closing certain juvenile proceedings, and determined that there was therefore no need to reach the constitutional question. See United States v. Three Juveniles, 61 F.3d 86, 90-92 (1st Cir.1995).
The process for handling CJA eligibility documents such as Connolly’s is not a blanket rule denying access. Rather, it strikes a balance under which disclosure is the presumed or default rule, but one which a court may displace by making a case-specific determination. Cf. Providence Journal, 293 F.3d at 12 (“Safeguards against prejudice can be implemented on a case-specific basis. Where a particularized need for restricting public access to legal memoranda exists, that need can be addressed by the tailoring of appropriate relief.”); Globe Newspaper Co. v. Pokaski 868 F.2d 497, 506-07 (1st Cir. 1989) (rejecting blanket rule in favor of case-by-case tailoring). The magistrate judge acted in accordance with this framework.
If a First Amendment right of access applies to this case, then it renders the entire discretion-based framework in the A.O. Guide unconstitutional. A court could meet the “stringent” First Amendment standard for sealing documents only *182 by articulating “an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest.” Providence Journal, 293 F.3d at 11 (quoting Press-Enterprise Co. v. Superior Court (Press-Enterprise I), 464 U.S. 501, 510, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984)). Despite its presumption of disclosure and its careful guidelines for exercising judicial discretion in overcoming the presumption, the AO. Guide framework falls below this level of stringency. Constitutionalizing the access question, as the dissent would do, thus displaces the policy established by Congress and the courts. If constitution-alized, the court’s discretion would be much more constrained and the balance would tilt much further toward disclosure. Applying the dissent’s analysis to future cases would similarly oust legislative and rulemaking determinations about the proper balance between disclosure and privacy in the courts.
C. First Amendment Right of Access
The Supreme Court recognized a qualified First Amendment right of access to certain judicial proceedings and documents in Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980). We examine two “complementary considerations” to determine if a constitutional right of access applies to particular documents such as Connolly’s CJA forms and the summary statement of the legal fees he owed for prior representation. Press-Enterprise Co. v. Superior Court (Press-Enterprise II), 478 U.S. 1, 8, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986); see Richmond Newspapers, 448 U.S. at 589, 100 S.Ct. 2814 (Brennan, J., concurring) (applying similar standards in earlier case); Pokaski, 868 F.2d at 502-04 (applying Press-Enterprise II test to documents). First, we look at whether materials like these three documents have been open to the public in the past, “because a tradition of accessibility implies the favorable judgment of experience.” Press-Enterprise II, 478 U.S. at 8, 106 S.Ct. 2735 (internal quotations omitted). Second, we ask “whether public access plays a significant positive role in the functioning of the particular process in question.” Id. If our inquiry into these considerations were to yield affirmative answers, the right could be overcome only by an “overriding interest.” Id. (quoting Press-Enterprise I, 464 U.S. at 510, 104 S.Ct. 819). We review constitutional access claims de novo. Providence Journal, 293 F.3d at 10.
Some courts have treated these considerations as a two-prong test, with a pair of elements that must both be satisfied. See, e.g., United States v. El-Sayegh, 131 F.3d 158, 160-61 (D.C.Cir.1997); Baltimore Sun Co. v. Goetz, 886 F.2d 60, 64 (4th Cir.1989). Connolly, not surprisingly, urges us to adopt this approach as well. We are unpersuaded that this is the correct reading of the “complementary considerations” of Press-Enterprise II. Because we find that neither of the standards is met here, however, we need not decide the question today.
1. Case Law Applying First Amendment Standards
The full scope of the constitutional right of access is not settled in the law. Courts have evaluated individual cases when they arose and have determined whether each fell within the category of judicial activities to which the right applies. See generally D. Paul & R.J. Ovelmen, Access, in 2 Communications Law 7 (Practicing Law Institute 1999) (classifying case law according to type of proceeding or document at issue). This process of case-by-case classification, based on the limited Supreme Court precedents, has produced a *183 list of proceedings and records that are covered by a First Amendment right of access and a list of those where no such right attaches.
Supreme Court precedent clearly extends the First Amendment right to cover access to criminal trials, Richmond Newspapers, 448 U.S. at 580, 100 S.Ct. 2814, including the voir dire of potential jurors, Press-Enterprise I, 464 U.S. at 509-10, 104 S.Ct. 819, and trial-like preliminary hearings in criminal cases, El Vocero v. Puerto Rico, 508 U.S. 147, 149-50, 113 S.Ct. 2004, 124 L.Ed.2d 60 (1993) (per curiam); Press-Enterprise II, 478 U.S. at 10, 106 S.Ct. 2735. See also Globe Newspaper, 457 U.S. at 610-11, 102 S.Ct. 2613 (overturning law requiring mandatory closing of criminal trials during testimony of minors who were victims of sexual abuse).
Beyond these few Supreme Court cases, lower courts have extended the right to various types of documents. This court has found the right applicable to legal memoranda filed with the court by parties in criminal cases, see Providence Journal, 293 F.3d at 11, and to records of completed criminal cases that, ended without conviction, see Pokaski, 868 F.2d at 505. See also Hurley, 920 F.2d at 97 (construing rules to require presumptive access to lists of jurors).
Courts have also held that no right of access applies to some other types of proceedings and documents. The paradigmatic example is the grand jury, whose proceedings are conducted in secret. See Press-Enterprise II, 478 U.S. at 9, 106 S.Ct. 2735 (citing Douglas Oil Co. v. Petrol Stops N.W., 441 U.S. 211, 218, 99 S.Ct. 1667, 60 L.Ed.2d 156 (1979)) (grand jury is “classic” example of properly closed proceeding); Fed.R.Crim.P. 6(e) (establishing general rule of grand jury secrecy with enumerated narrow exceptions); cf. Hurley, 920 F.2d at 94 (noting lack of public access to deliberations of petit jurors). The secrecy of the grand jury is so important that this court and others have found no right of access attaches to distinct hearings and documents because they could reveal secret grand jury information. E.g., Pokaski, 868 F.2d at 509; In re Motions of Dow Jones & Co., 142 F.3d 496, 500-03 (D.C.Cir.1998); United States v. Smith, 123 F.3d 140, 143 (3d Cir.1997). Courts have also rejected claims based on First Amendment rights of access to other types of documents, at least in certain circumstances. These have included discovery materials, Seattle Times Co. v. Rhinehart, 467 U.S. 20, 37, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984); Anderson v. Cryovac, Inc., 805 F.2d 1, 13 (1st Cir.1986), withdrawn plea agreements, ECSayegh, 131 F.3d at 161, affidavits supporting search warrants, Baltimore Sun, 886 F.2d at 64-65, and presentence reports, United States v. Corbitt, 879 F.2d 224, 228 (7th Cir.1989).
Two courts of appeals have considered the First Amendment right of access to documents concerning the CJA. In both cases, however, the documents at issue related to CJA payments to attorneys, which raise few privacy issues, rather than to the CJA eligibility documents filed by defendants. The results these courts reached were not entirely consistent. The Tenth Circuit found no First Amendment right of access to the vouchers or backup materials that attorneys submit to receive payment under the CJA. Gonzales, 150 F.3d at 1250. In a case concerned with access to the “barebones data” found in attorneys’ CJA vouchers[4] but not the more *184 detailed backup materials, the Second Circuit found a constitutional right of access. United, States v. Suarez, 880 F.2d 626, 630-31 (2d Cir.1989); cf. United States v. Ellis, 90 F.3d 447, 450-51 (11th Cir.1996) (avoiding deciding First Amendment issue in CJA case by resting decision on textual interpretation of regulations).
As these cases demonstrate, the First Amendment does not grant the press or the public an automatic constitutional right of access to every document connected to judicial activity. Rather, courts must apply the Press-Enterprise II standards to a particular class of documents or proceedings and determine whether the right attaches to that class.
2. Tradition
One response to the “tradition” inquiry would point to the relatively recent vintage of the CJA, first enacted in 1964, and conclude that there has not been enough time for a longstanding practice of across-the-board disclosure to develop under the statute. Tradition is not meant, we think, to be construed so narrowly; we look also to analogous proceedings and documents of the same “type or kind.” Rivera-Puig v. Garcia-Rosario, 983 F.2d 311, 323 (1st Cir.1992); see El Vocero, 508 U.S. at 150-51, 113 S.Ct. 2004 (finding pretrial criminal hearings in Puerto Rico analogous to other pretrial hearings to which First Amendment right applies, despite distinctions noted by Puerto Rico Supreme Court); Press-Enterprise II, 478 U.S. at 10-11, 106 S.Ct. 2735 (evaluating California pre-trial hearings by looking to practices of other states and to other types of hearings, including probable cause hearing in Aaron Burr’s 1807 trial for treason).
The analogies must be solid ones, however, which serve as reasonable proxies for the “favorable judgment of experience” concerning access to the actual documents in question. Id. at 8, 106 S.Ct. 2735.[5] The Herald strays too far from the particular nature of the CJA eligibility documents when it proposes two supposedly analogous traditions of openness, namely access to criminal trials and access to information about the expenditure of public funds.
The asserted “criminal trial” tradition is too broad an analogy. As seen from examples such as grand jury materials and pre-sentence reports, the mere connection of a document with a criminal case does not itself link the document to a tradition of public access. The Herald also argues that CJA eligibility determinations potentially implicate the defendant’s constitutional rights, and that an erroneous denial of eligibility could be grounds for reversal of a conviction, so that these decisions are fundamentally tied to the trial itself.[6] The *185 same could be said of other significant proceedings, including the grand jury, which remain closed. Documents submitted in conjunction with discovery proceedings, for example, do not thereby become part of the trial to which the tradition of access applies. See Anderson, 805 F.2d at 12; see also State ex rel. WHIO-TV-7 v. Lowe, 77 Ohio St.3d 350, 673 N.E.2d 1360, 1364 (1997) (applying rule on discovery to criminal proceeding).
Indeed, the breadth of the Herald’s attack would go to any document in a criminal case ordered sealed by a court. The CJA eligibility documents are peripheral to Connolly’s trial when compared to those processes where a tradition of access has triggered the First Amendment right, such as the selection of a jury, Press-Enterprise I, 464 U.S. at 505, 104 S.Ct. 819, or the legal memoranda submitted about the merits of the case, Providence Journal, 293 F.3d at 11. To conclude otherwise would create a right of access to everything remotely associated with criminal trials, and would be contrary to precedent employing more finely honed classifications.
The Herald also suggests that there is an “expenditure of public funds” tradition of access. This comparison collapses on examination as well. The premise is itself overbroad. Prosecutors, for instance, do not traditionally publish detailed information explaining their use of government resources, much less break it down on a case-by-case basis. See Gonzales, 150 F.3d at 1255. The CJA itself contemplates ex parte non-adversarial proceedings for certain determinations involving expenditures for indigent defense, despite the resulting expenditure of public funds.
As support for its “public funds” approach, the Herald argues that civil fee-shifting determinations have traditionally been public, and cites a district court opinion from Florida that used this analogy, United States v. Ellis, 154 F.R.D. 692, 695-96 (M.D.Fla.1993), aff'd on other grounds, 90 F.3d at 451 (“In the civil context, there is a long history of detailed disclosure about attorney fees and the services rendered when there is a fee-shifting statute or contract.”). That tradition is very different from the facts at hand. See generally Gonzales, 150 F.3d at 1257 (rejecting similar analogy between fee-shifting and CJA). Fee-shifting disputes occur in the context of adversarial litigation. Id. The claimant files a public document stating its fees and costs. That document is more akin to a statement of CJA funds paid to attorneys after they have been appointed — a statement which is generally made public and is quite different from data about a criminal defendant’s personal financial circumstances. Moreover, attorney’s fees in civil cases can be conceptualized as part of the award to a prevailing party for unlawful conduct against it if certain standards are met. See, e.g., Tamko Roofing Prods., Inc. v. Ideal Roofing Co., 282 F.3d 23, 30-32 (1st Cir.2002) (analyzing attorney’s fee awards under Lan-ham Act in context of losing party’s unlawful behavior). No such similar policy is involved in the determination that a defendant is eligible to have counsel appointed under the CJA.
Connolly offers a better analogy when he cites to government benefits programs administered by the executive branch, where the strong tradition is one of confidentiality rather than disclosure. See, e.g., 42 U.S.C. § 302(a)(7) (2000) (establishing safeguards to prevent public disclosure of information about Social Security recipients). We would think it the exception, not the rule, to require applicants for benefits programs to disclose private financial data about themselves and their immediate family to the public.
*186 Finally, the Herald’s reliance on dicta in Foley v. City of Lowell to demonstrate the “public funds” tradition is misplaced. 948 F.2d 10, 19 (1st Cir.1991) (“[T]he continued viability of and confidence in the public funding of certain litigation are dependent on the perception that claims for counsel fees are subject ... to the independent review of a court.”) (emphasis added by petitioner-appellant; internal quotation omitted). Foley had nothing to do with the CJA; it analyzed civil fee-shifting in a police brutality ease under 42 U.S.C. § 1988. See 948 F.2d at 18. More fundamentally, Foley had nothing to do with public access; it concerned a court’s independent duty to probe a civil plaintiffs calculation of awarded attorney’s fees when the governmental defendant who would pay the fees “mounted no meaningful opposition” to it. Id. at 19 (“At least where public funds are involved or the public interest is otherwise implicated, the court has a duty to consider the application critically to ensure overall fairness.... ”). None of this lends any support to the existence of a relevant tradition of public access.
The “judgment of experience” does not support a constitutional right of access to CJA eligibility materials.
3. Positive Functional Role
The other consideration under Press-Enterprise II is whether access to CJA eligibility documents “plays a particularly significant positive role in the actual functioning of the process.” 478 U.S. at 11, 106 S.Ct. 2735. Here, the process in question is one of determining eligibility for CJA assistance. Not only does public access to a defendant’s financial documentation in support of a CJA application fall short of this standard, more likely it would play a negative role.
The scope of this standard warrants clarification. The Herald misinterprets the proper inquiry when it argues that privacy interests may receive no consideration at all during this stage. Instead, according to the Herald, “countervailing interests do not even enter into the analysis until after the qualified right has been established.” Only at that point, says the Herald, when the court considers whether particular circumstances overcome a qualified right of access, may it look to privacy or other concerns that militate against disclosure in a given case. But a test that is blind to the functional drawbacks of access becomes no test at all. The reason is that “there are some kinds of government operations that would be totally frustrated if conducted openly,” Press-Enterprise II, 478 U.S. at 9, 106 S.Ct. 2735 (discussing functional standard), or would at least be hindered. It may be that the process of determining CJA eligibility is one of those. That cannot be ascertained without some reference to the potential problems created by public access as well as to the advantages.[7]
*187 First, CJA eligibility determinations, if they are judicial at all, lie far from the core of judicial power or the merits of the criminal case. Many of the flagship functional justifications for access thus become less relevant. Unlike trials themselves, access to the defendant’s CJA financial statements does not provide an “outlet for community concern, hostility, and emotion” concerning a crime. Richmond Newspapers, 448 U.S. at 571, 100 S.Ct. 2814. And, unlike other decisions that may “impose official and practical consequences upon members of society at large,” id. at 597, 100 S.Ct. 2814 (Brennan, J., concurring), CJA eligibility determinations never do so.
A remaining functional “advantage” which the Herald advances is the oft-cited need for the public to have the “full understanding” necessary to “serve as an effective check on the system.” Pokaski, 868 F.2d at 502, quoted in Providence Journal, 293 F.3d at 10. In isolation, the “full understanding” rationale proves too much — under it, even grand jury proceedings would be public. As to the “effective check” rationale, we have doubts about whether public scrutiny of an applicant’s financial data would actually improve judges’ decisionmaking as to CJA eligibility. See Gonzales, 150 F.3d at 1260.
Under the A.O. Guide framework, CJA eligibility decisions will be fully open to public scrutiny in cases where no particular privacy concerns are present for whatever reasons, or where the defendant does not object to disclosure. The fact that an application was filed and an attorney appointed are public matters which are entered on the docket of a case. The general reason for Connolly’s financial need, rational on its face, was articulated in the order appointing his attorney, also a public document. The amounts of money paid to Connolly’s attorney will presumably be made public in due course under the newest version of § 3006A(d)(4). The only significant aspects of Connolly’s CJA application that were not made public are the details of his family’s assets, liabilities, and financial obligations.
Public access to a defendant’s financial information would not usually facilitate greater accuracy in decisionmaking. The standards for granting CJA assistance are flexible and give the benefit of the doubt to a defendant who applies for aid. The type of information on the forms is not typically in the public domain and so the public is not well-positioned to challenge accuracy. If the judge has doubts about the accuracy of the financial information submitted, the data may be investigated or more information provided by defendants, court officers, or prosecutors. See VII A.O. Guide § 2.03. If the data is inaccurate, the court may rescind the appointment and order the defendant to repay any funds spent. 18 U.S.C. § 3006A(f). Since a defendant’s financial condition is usually investigated in the process of preparing a presentence report, the court is aware that, in the event of a conviction, there will be an independent examination of a defendant’s financial status at that time. In addition, there are possible criminal consequences for a defendant who knowingly files false information; CJA Form 23 indicates clearly that it is signed and submitted under penalty of perjury.
Finally, each individual CJA appointment may involve a comparatively small amount of money, normally capped at $5,200 for a felony case. See 18 U.S.C. § 3006A(d)(2). The actual amount of money spent on appointed counsel is public. See id. § 3006A(d)(4). Under the functional standard of Press-Enterprise II, the real-world “positive role” of public scrutiny of CJA eligibility materials is negligible at best.
*188 On the other hand, the disclosure of a defendant’s sensitive personal financial information, which has no bearing on the merits of the criminal trial, could well undermine the judicial process in other ways. In itself, the invasion of privacy inherent in disclosing this data is of concern. See Corbitt, 879 F.2d at 230-32 (weighing defendants’ personal privacy interests when maintaining seal on presentence reports). This concern is magnified by the crucial role of the CJA as a vehicle to effectuate Sixth Amendment rights for defendants who cannot afford legal representation.
A constitutionally-based right, of access to otherwise private personal financial data of one’s own and one’s family imposes a high price on the exercise of one’s constitutional right to obtain counsel if in financial need. Our system of justice cherishes “the principle that defendants are not to be avoidably discriminated against because of their indigency.” Holden v. United States, 393 F.2d 276, 278 (1st Cir.1968). But a strict disclosure requirement could well discourage eligible defendants from availing themselves of their right to counsel by forcing them to choose between privacy and CJA assistance — a choice that other defendants do not face.[8] The specter of disclosure also might lead defendants (or other sources called upon by the court) to withhold information. Public disclosure of such information may put them at risk of harm to their property or their families if the information is misused by their enemies. There is a prospect of unbalancing the scales in a criminal prosecution if the information in CJA application materials could assist the prosecution, thus raising the specter of claims of denial of Fifth Amendment rights. Cf. Gonzales, 150 F.3d at 1259 (“[CJA] information obtained after judgment could still be used by the government to investigate and bring new charges.... ”). Such effects tend to disrupt, not enhance, the functioning of the process.
Under the Federal Rules of Criminal Procedure, presentence reports must contain the very same type of financial information as is found in CJA forms. See Fed.R.Crim.P. 32(d)(2)(A)(ii). But presen-tence reports are presumptively confidential documents. “[T]he courts have typically required some showing of special need before they will allow a third party to obtain a copy of a presentence report.” U.S. Dep’t of Justice v. Julian, 486 U.S. 1, 12, 108 S.Ct. 1606, 100 L.Ed.2d 1 (1988); see United States v. Smith, 13 F.3d 860, 867 (5th Cir.1994); Corbitt, 879 F.2d at 229. This standard for disclosure is obviously not the First Amendment standard, which presumes disclosure. As another circuit noted, even in the face of a Brady request for information from another defendant’s presentence report, the financial condition of the defendant is confidential and intensely personal. United States v. Trevino, 89 F.3d 187, 191 (4th Cir.1996). No circuit court has held that third parties have a constitutional right of access to presentence reports; rather, courts have reached the contrary result. See Corbitt, 879 F.2d at 237. Self-evidently, the pre-sentence report, on which sentences are based, is closer to the heart of judicial proceedings than the CJA eligibility documents. It is difficult to understand why, if there is no First Amendment right of access to information about a defendant’s financial condition at sentencing and during his imprisonment, there could be a *189 First Amendment right of access to a statement of the defendant’s financial information at trial, when he is presumed innocent and is merely exercising his Sixth Amendment right to counsel.
On balance, then, disclosure would not play “a particularly significant positive role in the actual functioning of the process” of determining CJA eligibility. Press-Enterprise II, 478 U.S. at 11, 106 S.Ct. 2785. Rather, disclosure is likely to play a negative role. Nor do the lessons of tradition support the wisdom of public access. The First Amendment does not grant a right of access, over the defendant’s objection, to financial documents submitted to demonstrate the defendant’s eligibility for CJA funds. The current CJA framework, in which these materials are typically disclosed unless the court decides that the documents should be sealed, is constitutional.
D. Common Law Presumption of Access
In addition to any constitutional right, there is also a presumption of public access to “judicial records” under the common law. Nixon v. Warner Communications, Inc., 435 U.S. 589, 597, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978); Anderson, 805 F.2d at 13. The Herald argues that this presumption invalidates the sealing of Connolly’s CJA eligibility documents. Assuming that any common law right has not been displaced by the statute, see Gonzales, 150 F.3d at 1263, we hold that the presumption is not applicable to these types of documents, and that if it were, the magistrate judge still correctly exercised his discretion in finding it overcome by countervailing interests.
The common law presumption is limited to “judicial records.” As we have established already, we do not think that CJA eligibility documents qualify as such. Rather, they are administrative paperwork generated as part of a ministerial process ancillary to the trial. While the review of these documents is conducted by a district judge or magistrate judge, that role could have been assigned to another institution.
In cases considering the common law right, this court has often used a definition of a “judicial record” which refers to “materials on which a court relies in determining the litigants’ substantive rights.” See, e.g., Providence Journal, 293 F.3d at 16 (quoting Anderson, 805 F.2d at 13). The Herald seizes on this language and argues that the right to counsel in a criminal trial is, of course, a substantive right guaranteed by the Sixth Amendment. This argument takes our shorthand definition out of context. In Anderson, where it originated, the phrase was used to distinguish documents presented to a judge in connection with a discovery dispute from the record on which a judge actually decides the central issues in a case. 805 F.2d at 13 (“[DJiscovery is fundamentally different from those proceedings for which a [common law] public right of access has been recognized.”). Similarly, we have applied this definition to documents on which a court relied in approving a consent decree because that approval settled a civil enforcement action. Standard Fin. Mgmt., 830 F.2d at 408-09.
Here, in contrast, the court did not conduct its review of Connolly’s finances in order to dispose of any issue as to the elements of the criminal charges against him. As in Anderson, the CJA eligibility documents related merely to the judge’s role in management of the trial. Cf. Standard Fin. Mgmt., 830 F.2d at 408 (excluding from presumption “documents which play no role in the adjudication process”). Other administrative decisions that effectuate constitutional rights are made outside the judiciary entirely, and create no presumption of access to the documents *190 used in the decision. For example, prisoners are constitutionally entitled to medical treatment, Estelle v. Gamble, 429 U.S. 97, 102-104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), but the decision to provide treatment is not thereby “judicial,” nor do a prisoner’s medical records thereby become “judicial documents.” Cf. Doe v. Delie, 257 F.3d 309, 315-16 (3d Cir.2001) (privacy of prisoner medical information).
Even assuming that CJA eligibility documents were covered by a common law presumption of access, we would still affirm the magistrate judge’s decision to maintain the sealing of Connolly’s CJA application materials. The standard for our review is abuse of discretion. Siedle v. Putnam Invs., Inc., 147 F.3d 7, 10 (1st Cir.1998) (“The trial court enjoys considerable leeway in making decisions of this sort.”). “[T]he decision as to [common law] access is one best left to the sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case.” Nixon, 435 U.S. at 599, 98 S.Ct. 1306. The magistrate judge’s short but clear order balanced the public interest in the information against privacy interests, and his conclusion was not an abuse of discretion.
Personal financial information, such as one’s income or bank account balance, is universally presumed to be private, not public. See United States v. Amodeo (Amodeo II), 71 F.3d 1044, 1051 (2d Cir.1995) (courts analyzing common law presumption should “consider the degree to which the subject matter is traditionally considered private rather than public”). The magistrate judge sensibly concluded that Connolly’s strong interest in the privacy of his and his family’s personal financial information outweighs any common law presumption in these circumstances.
Recognition of the importance of financial privacy is also enshrined in public policy. The Freedom of Information Act, applicable only to executive branch materials, exempts personal and confidential financial information from disclosure. See 5 U.S.C. § 552(b)(4) (2000). Congress recently singled out financial information for special privacy protection when it approved an overhaul of the nation’s banking regulations. See Gramm-Leach-Bliley Act of 1999 (GLB Act), Pub.L. No. 106-102, §§ 501-510 (1999) (codified at 15 U.S.C. §§ 6801-6809 (2000)); Trans Union LLC v. Fed. Trade Comm’n, 295 F.3d 42 (D.C.Cir.2002) (upholding regulations implementing GLB Act’s privacy provisions). See generally Elec. Privacy Info. Ctr., The Gramnu-Leachr-Bliley Act, at http:/Avww.epie.org/privacy/glba. States are also considering greater protection for financial privacy. See Gen. Accounting Office, Financial Privacy (April 2002) (summarizing state implementation of GLB Act’s provisions concerning insurance industry); A. Clymer, North Dakota Tightens Law on Bank Data and Privacy, N.Y. Times, June 13, 2002, at A28 (reporting that 72 percent of voters in statewide referendum supported tighter financial privacy restrictions than federal law); R. Gold, States Mull Optr-In, Optr-Out Rules, Wall St. J., Mar. 13, 2002, at B8, available at 2002 WL-WSJ 3388589 (reporting greater interest in state legislatures because “consumers [are] increasingly worried about having their financial data open to scrutiny”).
In addition, the Supreme Court has explained that a court considering the common law presumption enjoys “supervisory power” to deny access where “court files might have become a vehicle for improper purposes” and to “insure that its records are not ‘used to gratify private spite or promote public scandal.’ ” Nixon, 435 U.S. at 598, 98 S.Ct. 1306 (quoting In re *191 Caswell, 18 R.I. 835, 29 A. 259, 259 (R.I. 1893)). The magistrate judge would be well within his discretion to consider this factor as well.
Finally, the invasiveness of the disclosure sought here is further intensified because the information pertains not only to Connolly, but also to his wife and children. See Amodeo II, 71 F.3d at 1050 (giving increased weight to privacy interests of “innocent third parties”).
Thus, even if a common law presumption applied to Connolly’s CJA forms and statement of prior legal fees, we would still affirm the magistrate judge’s decision.
III.
While the Herald has presented its case ably, we hold that neither the First Amendment nor the common law provides a right of access to financial documents submitted with an initial application to demonstrate a defendant’s eligibility for CJA assistance. We also hold that, even if there were a common law presumption of access, then it would be outweighed here, as the courts below found, by Connolly’s countervailing privacy interests. There may come a time in the future of these proceedings when it would be appropriate to lift the seal on Connolly’s CJA application materials; we leave that decision, like the original decision to seal, to the discretion of the district court.
The petition for a writ of mandamus is denied and the decision of the district court is affirmed.

. The judges of the District of Massachusetts have adopted a local CJA plan which looks to the A.O. Guide as binding. See 18 U.S.C. § 3006A(a) (requiring each district court to adopt plan); United States Dist. Court for the Dist. of Mass., Plan for Implementing the Criminal Justice Act of 1964, As Amended, 18 U.S.C. § 3006A, § DÍ.B (1993) (stating that judicial officers in the District of Massachusetts "shall comply with the provisions” of the A.O. Guide concerning implementation of the CJA).

. The details of that provision have since been amended twice. See Pub.L. No. 106-113, Apx. A, § 308(a) (1999); Pub.L. No. 105-119, § 308 (1997). Neither amendment affected the silence concerning CJA eligibility documents.

. At the federal level, there have also been suggestions of a diminished role for judges in the administration of the CJA. See, e.g., Gonzales, 150 F.3d at 1255 n. 11 ("We note that there is much support for the replacement of [federal] judges with an independent administrative board....”); J.J. Cleary, Federal Defender Systems, Law & Contemp. Probs., Winter 1995, at 65, 69-75 (arguing for independent structure to administer CJA). But see VII A.O. Guide § 2.03(A) ("The determination of eligibility under the Criminal Justice Act is a judicial function to be performed by a federal judge or magistrate after making appropriate inquiries concerning the person's financial condition.”).

. Given the congressional amendments noted earlier, this type of “barebones data” is now independently subject to disclosure under statute. Even there, however, the judge uses *184 discretion to consider a set of specified factors and redact certain information accordingly. See 18 U.S.C. § 3006A(d)(4)(D).

. The dissent suggests glossing over the review of tradition when examining "proceedings of recent origin.” We do not think we are free, under Press-Enterprise II, to simply ignore tradition. Analogies will frequently prove useful reasoning tools which lawyers are well trained to employ. See generally C.R. Sunstein, On Analogical Reasoning, 106 Harv. L.Rev. 741 (1993). While the absence of analogous tradition might not doom a claim where the functional argument for access to a type of judicial document is strong, this is not such a case.

. We can imagine situations where a defendant’s eligibility for CJA funding might arise in the core of criminal proceedings, such as in an appeal challenging the denial of aid on Sixth Amendment grounds. See, e.g., United States v. Manning, 79 F.3d 212, 218-19 (1st Cir.1996) (reviewing district court denial of expert services for trial under CJA). Those scenarios are far removed from the case before us — the defendant is in a different posture and the interests involved are different— and we do not consider them here.

. Once a First Amendment right attaches, during the next stage, when the court decides whether the qualified right is overcome, it considers factors relevant to a particular case. See, e.g., Pokaski, 868 F.2d at 506 & n. 17 (discussing how some individual defendants may demonstrate circumstances particular to their case requiring the sealing of records that are otherwise covered by qualified First Amendment right of access). We do not rely on factors which are atypical of a process when considering whether the right attaches to that process in general. For example, Connolly notes that his CJA forms include the amount of certain family medical bills; this is idiosyncratic to his case and would be an inappropriate basis for determining the applicability of the right as a whole. The broader privacy concerns we articulate in the text, however, would be common to most CJA applicants.

. The dissent notes that indigent criminal defendants will have little choice but to accept the loss of privacy in exchange for CJA funds; this observation makes the case against disclosure stronger, not weaker. The law does not force criminal defendants to make such a Hobson's choice.