WILLIAMS, Senior Circuit Judge,
concurring in part and concurring in the judgment:
I join Parts I and III of Judge Randolph’s opinion. I write separately to explain why I view the First Amendment analysis through a different lens than the one he applies in Part II of his opinion. While my approach leads to the same result as his, my conclusions are more tentative and my doubts more pronounced.
[[Image here]]
The Supreme Court has sketched a two-stage process for resolving whether the First Amendment affords the public access to a particular judicial record or proceeding. First the court must determine whether a “qualified First Amendment right of public access” exists. Press-Enterprise Co. v. Superior Court, 478 U.S. 1, 9, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986). If so, then the potential qualification comes into play, and the record or proceeding may be closed only if “closure is essential to preserve higher values and is narrowly tailored to serve that interest.” Id. at 13-14, 106 S.Ct. 2735. Assuming the existence of such a qualified right in this case, all members of the panel agree that the compelling national security considerations discussed in Part *1103 III of Judge Randolph’s opinion render that right unavailable here.
But on the question of how to determine if that qualified right actually exists, we see things somewhat differently. In analyzing that issue, the Supreme Court has identified two requirements that it calls the “tests of experience and logic.” Id. at 9, 106 S.Ct. 2735; see also In re Reporters Committee for Freedom of the Press, 773 F.2d 1325, 1331-32 (D.C. Cir. 1985) (Scalia, J.). The “experience” inquiry looks to “whether the proceeding has historically been open.” Reporters Committee, 773 F.2d at 1331. And the somewhat oddly-labeled “logic” inquiry asks “whether the right of access plays an essential role in the proper functioning of the judicial process and the government as a whole.” Id. at 1332. Both tests must be satisfied before we can conclude that the First Amendment provides a qualified right of access. Id.
Before trying to work through those questions, I note that the government doesn’t contest the premise that the documents here are judicial records. Accordingly, I assume that they are — but it is by no means obvious. Merely filing a document with the district court isn’t enough to transform it into a judicial document. See, e.g., SEC v. AIG, 712 F.3d 1, 3-4 (D.C. Cir. 2013). Absent a judicial decision, the documents filling district court dockets are no more than litigants’ requests for action (or inaction). United States v. El-Sayegh, 131 F.3d 158, 162 (D.C. Cir. 1997). To become judicial records, the files must play some role in the adjudicatory process — i.e., in the judicial decision at hand. See AIG, 712 F.3d at 3 (quoting El-Sayegh, 131 F.3d at 163). Justice Holmes long ago articulated the basic reason in a somewhat different context:
It is desirable that the trial of causes should take place under the public eye, not because the controversies of one citizen with another are of public concern, but because it is of the highest moment that those who administer justice should always act under the sense of public responsibility, and that every citizen should be able to satisfy himself with his own eyes as to the mode in which a public duty is performed.
Cowley v. Pulsifer, 137 Mass. 392, 394 (1884), quoted in Reporters Committee, 773 F.2d at 1335.
Here it is unclear whether the district court “made [any] decisions about the[] [disputed recordings] or that otherwise relied on them.” AIG, 712 F.3d at 4. What we do know is that Dhiab’s attorneys attached three (of the more than thirty) videos to a brief seeking a temporary restraining order and that the district court denied that TRO after a classified hearing. See Notice of Filing, Dhiab v. Obama, No. 05-1457 (GK) (June 14, 2014), ECF. No. 252; Order, Dhiab v. Obama, No. 05-1457 (GK) (June 16, 2014), ECF No. 254. But we don’t know if those videos (or others) were played at the hearing or if they might have been understood as a basis for the district court’s decision. And by the time the district court ruled on Dhiab’s request for a preliminary injunction, the government had stopped performing forced cell extractions on him and so the district court offered no opinion on their legality. See Dhiab v. Obama, 74 F.Supp.3d 16, 21 (D.D.C. 2014). Since videos that show only his extraction were thus irrelevant to the district court’s adjudication of the remaining challenges, such recordings (if any) could not be judicial records. See AIG, 712 F.3d at 3-4; El-Sayegh, 131 F.3d at 163. Videos that include footage of the force feedings pose a closer question, but the answer is hardly clear. Nowhere in the district court’s injunction opinion does it rely on the videos expressly. Indeed, the only mention of those recordings is in a quick recitation of *1104 the procedural history. 74 F.Supp.3d at 20. While that opinion refers to certain government exhibits in discussing whether the feeding process is painful, it identifies those exhibits only by number, so we don’t know whether they include the disputed videos. See id. at 25-26. Again, as the government didn’t raise the argument, I proceed on the assumption that all of the disputed videos are judicial records and proceed to the task of divining the possible existence of a qualified First Amendment right of access.
* * *
A preliminary concern is posed by our declaration several years ago that the “experience and logic test ... has been limited to judicial proceedings that are part of the criminal trial process” and that “[n]either the Supreme Court nor this court has. applied” it outside that context. Center for Nat’l Security Studies v. DOJ, 381 F.3d 918, 935 (D.C. Cir. 2003) (emphasis added). But Reporters Committee proves otherwise; there we applied the test to documents used in civil summary judgment proceedings. It’s true that we’ve never found a qualified First Amendment right outside the criminal context, but we’ve never categorically ruled it out either (and many other circuits have concluded that such a right exists in civil and even administrative matters, e.g., N. Y. Civil Liberties Union v. N.Y.C. Trans. Auth., 684 F.3d 286, 297-98 (2d Cir. 2011)). And in Center for National Security Studies we noted that the records sought consisted of “investigatory information” not “information relating to a government adjudicative process,” and, anticipating El-Sayegh, we saw that fact as precluding the application of the' First Amendment access right. 331 F.3d at 936. In short, then, the fact that habeas proceedings are formally civil is no obstacle to use of the experience-and-logic framework.
That issue cleared aside, I next turn to the level of generality at which we should consider the “experience” bearing upon the proceedings or records in question. The Court has appeared to focus on the “particular proceeding in question,” Press-Enterprise, 478 U.S. at 9, 106 S.Ct. 2735, but without explaining whether we look to broad or narrow categories and without precluding focus on types of documents rather than proceedings. If proceedings are the subject of analysis, the likely categories here may range among civil actions generally, habeas actions, habeas actions relating to conditions of confinement, and finally habeas actions related to Guantanamo.
Despite the Supreme Court’s apparent interest in the “proceedings,” courts have often, where documents were at issue, turned directly to the documents in dispute, and applied the “experience and logic” ideas to them. See, e.g., United States v. Erie County, 763 F.3d 235, 241 (2d Cir. 2014); In re Boston Herald, Inc., 321 F.3d 174, 182 (1st Cir. 2003); United States v. Corbitt, 879 F.2d 224, 229 (7th Cir. 1989). And in Reporters Committee, we spoke initially of “proceedings,” but then slipped seamlessly to addressing the type of documents sought. 773 F.2d at 1330-41.
One is tempted to dismiss all of this as immaterial, on the theory that we have a case of “pay me now or pay me later.” If disclosure risks inflicting serious harm, it will emerge either in the assessment of experience and logic (here, for example, by focusing on Guantanamo habeas cases, dominated as they are by classified information), or as a trigger of the right’s qualification (because the classified character of the documents meets the government’s burden of showing a compelling need for secrecy).
Not so fast. Intervenors point to Globe Newspaper Co. v. Superior Court, 457 U.S. *1105 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982), where the Court applied its experience- and-logic tests to criminal trials generally, rejecting the state’s effort to make the classification at the level of the testimony in question — that of a minor child in a sexual abuse case. Id. at 605 n.13, 102 S.Ct. 2613. The Court made no claim that experience and logic dictated openness for that segment of the case. But, turning to the government’s burden, it rejected the claim that the interests for excluding the public were compelling. Thus the parties claiming access had a fairly easy ride to showing experience and logic, and the government faced an uphill battle on its justification for privacy. Resolving the level of generality affected not only who bore the burden of persuasion but also the severity of that burden.
Apart from choosing the level of generality at which to assess the “proceeding” (plus the choice between proceeding and documents), the “experience” test requires a decision on what “history” is relevant. Yet we have no more guidance here. Reporters Committee tells us that a “historical tradition of at least some duration is obviously necessary,” 773 F.2d at 1332, but doesn’t tell us how long is long enough. As Judge Randolph notes, pre-ratification history is surely relevant, Randolph Op., Part II, at 1093 n.12, but courts have plainly not seen the relevant history as limited to proceedings before 1791. Press-Enterprise itself relied exclusively on history that post-dated the First Amendment to some extent or another. Compare 478 U.S. at 10-12 & n.3, 106 S.Ct. 2735 (considering 1807 treason trial of Aaron Burr and modern cases showing that most states required preliminary hearings be held in open court), with id. at 22-25, 106 S.Ct. 2735 (Stevens, J., dissenting) (arguing that the inquiry should look to history “at the time the First Amendment was adopted,” not those “recent common-law developments”). And unlike the plurality opinion in Richmond Newspapers, Inc. v. Virginia, which traced the history of trial access back to “the days before the Norman Conquest,” 448 U.S. 555, 565, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980), our decision in Reporters Committee relied heavily on late-nineteenth and early-twentieth century case law, 773 F.2d at 1332-36; see also Detroit Free Press v. Ashcroft, 303 F.3d 681, 700 (6th Cir. 2002) (collecting cases from the Third, Sixth, and Ninth Circuits relying on more recent history). Admittedly none of those decisions explicitly grappled with this question, but they at least raise doubt about stopping the historical clock at 1791.
Here the parties have neither provided a comprehensive history or sought to explain why only certain history is relevant. The government’s historical analysis amounts to nothing more than a few citations to relatively recent cases and a brief discussion of the Classified Procedures Information Act of 1980. See App. Br. at 48-49. Intervenors were similarly cursory, citing a handful of mostly recent cases before jumping into their competing interpretation of CIPA. See Intervenors’ Br. at 27-28, 31-35 & nn.4, 7. But neither side tells us why those cases or CIPA might be relevant to the historical tradition. And— other than intervenors’ throwaway citation to Ex Parte Milligan, 71 U.S. 2, 4 Wall. 2, 18 L.Ed. 281 (1886)—neither gives a hint of what the tradition of access was like pre-1970, much less pre-1791. Judge Randolph’s opinion identifies evidence that a substantial portion (20%) of early English habeas cases were heard and decided privately. See Randolph Op., Part II, at 1093-94 (citing Paul D. Halliday, Habeas Corpus: prom England to Empire 54, 56-57 (2010)). And that evidence appears persuasive. Besides, focus on such evidence has the advantage of being consistent with the idea that those who adopted the First Amendment meant to embody a pre-exist-ing right of access to judicial proceedings *1106 and records. See Richmond Newspapers, 448 U.S. at 575-76, 100 S.Ct. 2814. If that were the historical inquiry, all we’d need to know would be whether the access sought was available before 1791. See Press-Enterprise, 478 U.S. at 22, 106 S.Ct. 2735 (Stevens, J., dissenting). But the cases don’t demand any such focus or read the right so narrowly. Nor do they give any guidance on how to choose among potentially relevant time spans; we’re left simply to guess at what history might be relevant.
We’re similarly in the dark in terms of how consistent a tradition of openness must be within a given time span. The Court has told us that an “unbroken, un-contradicted history” will do the trick, Richmond Newspapers, 448 U.S. at 573, 100 S.Ct. 2814, but has also found a qualified First Amendment right when there’s a “near uniform [historical] practice,” Press-Enterprise, 478 U.S. at 10, 106 S.Ct. 2735 (emphasis added). But while its use of the word “near” tells us that the tradition can have gaps, we don’t know how close to uniform the tradition needs to be. Perhaps, as Judge Rogers suggests, it’s enough that the public historically had access at least 80% of the time. See Rogers Op. at 1100. (Though most teachers would likely doubt the wisdom of calling a score of 80% “overwhelming.”) On the other hand, as Judge Randolph argues, it’s certainly hard to say that there’s “an unbroken, uncontradicted history” of public access when 20% of the cases were heard privately. See Randolph Op., Part II, at 1093-94. Both positions seem reasonably grounded in the Court’s precedents, but obviously both can’t be right. Luckily, however, nothing in this case requires us to guess at how to resolve that troublesome issue, so it is enough for us to note the questions left unanswered by the Court’s precedents.
Putting those doubts aside for a moment, at least one thing is clear: If the experience-and-logic framework is to be applied to Guantanamo habeas cases, at least the “logic” part — whether public access would play a significantly positive role in these proceedings — seems relatively easy. Boumediene v. Bush (and the standing protective orders for the Guantanamo cases) recognize that detainees litigating these cases have a practical need for classified information to contest the legality of their detention, see 553 U.S. 723, 784-86, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008), a premise that in light of Aamer v. Obama, 742 F.3d 1023 (D.C. Cir. 2014), extends to conditions of detention. But as the interve-nors themselves recognize, the government could “oppose the disclosure of classified material as privileged under the state secrets doctrine,” Intervenors’ Br. at 35, and would have every reason to do so in light of its national-security concerns. Judge Randolph’s discussion of United States v. Reynolds, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953), and Totten v. United States, 92 U.S. 105, 23 L.Ed. 605 (1875), drives home the point that the government could short-circuit the entire Guantanamo habeas process by invoking that privilege and thereby depriving detainees (and also the courts) of potentially critical information. See Randolph Op., Part II, at 1092-93, 1094-95. (Indeed, since the criteria to classify information as “SECRET” appear to be more stringent than the privilege test we articulated in Halkin v. Helms, 598 F.2d 1, 9 (D.C. Cir. 1978), it seems likely that the government could withhold any information properly classified at that level.) It therefore seems safe to say that disclosure would not play a positive role in those proceedings; to the contrary, it might substantially hollow them out, perhaps to the point of raising a Suspension Clause question.
* * *
In short, then, under current understandings, choices as to level of generality *1107 for the relevant proceedings (and between proceedings and documents), and the scope of the relevant historical inquiry, can easily be decisive, both in shifting the burden of persuasive and in its rigor. Yet we have little guidance from the Supreme Court, or indeed any other, as to how to make those choices.
In this case, however, we can avoid these questions. Even if we are to apply a higher level of generality (perhaps habeas generally or even just civil matters) or to look to relatively recent history, and even if doing so would show experience and logic to lie on the intervenors’ side, it is of no consequence — in view of our conclusion that the security interests invoked by the government are compelling (and no lesser remedy is available than preserving them from public access). I therefore join with my colleagues in reversing the district court.