# United States Court of Appeals
## For the First Circuit

Nos. 05-1658, 05-1666

In re GITTO GLOBAL CORP., Debtor

GARRY GITTO and CHARLES GITTO,

Appellants,

v.

WORCESTER TELEGRAM & GAZETTE CORP.; MEDIANEWS GROUP, INC.;
CHARLES L. GLERUM, EXAMINER; AND
PHOEBE MORSE, UNITED STATES TRUSTEE,

Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Torruella and Lipez, Circuit Judges,
and Barbadoro,[*] U.S. District Judge.

Max Stern, with whom Lillian Hirales and Stern, Shapiro, Weissberg & Garin, LLP were on brief, for appellant Gary Gitto.
Juiliane Balliro, with whom Paul Leoni, Christine M. Griffin, and Perkins, Smith & Cohen LLP were on brief, for appellant Charles Gitto.
Jonathan M. Albano, with whom Aaron Wais, Bingham McCutchen LLP, David McCraw, and The New York Times Co. were on brief, for appellee Worcester Telegram & Gazette Corp.
Peter J. Caruso, with whom Peter J. Caruso II and Caruso & Caruso LLP were on brief, for appellee MediaNews Group, Inc.

---

[*]Of the District of New Hampshire, sitting by designation.

Robert M. Buchanan, Jr., with whom Charles L. Glerum, Joseph M. Downes III, and Choate, Hall & Stewart LLP were on brief, for appellee Charles Glerum, Examiner.

————————————————

August 31, 2005

————————————————

**LIPEZ, <u>Circuit Judge</u>**.  This case presents a matter of first impression in our circuit, requiring us to interpret 11 U.S.C. § 107(b)(2), which provides an exception to the rule of public access to papers filed in a bankruptcy case for material that is "scandalous or defamatory."  Appellants Charles and Gary Gitto (collectively, "the Gittos"), who were formerly associated with a company that has since filed for bankruptcy protection, assert that an investigative report ("Report") compiled by a court-appointed bankruptcy examiner ("Examiner") falls within the § 107(b)(2) exception and that it must therefore be redacted or sealed.  The bankruptcy court rejected this contention, finding that the appellants had not demonstrated that the material at issue was scandalous or defamatory and that it therefore must be publicly available under 11 U.S.C. § 107(a).  The district court affirmed, although it applied a different interpretation of § 107(b)(2) than the one adopted by the bankruptcy court.

On appeal, the Gittos advance a reading of § 107(b)(2) that is broader than the one used by either the bankruptcy court or the district court, and assert that they are entitled to protection under that exception.  The appellees, two media organizations -- Worcester Telegram & Gazette Corp. ("WT&G") and MediaNews Group, Inc. ("MediaNews") -- and the Examiner, urge us to reject the Gittos' interpretation of § 107(b)(2) and to find that the public has a right of access to the Report.

-3-

Although we modify somewhat the interpretation of § 107(b)(2)set forth by the district court, we affirm its decision that the public has a right of access to the Report.[1]

**I.**

Gitto Global Corp. ("Gitto Global"), a plastics manufacturer in Lunenberg, Massachusetts, filed for Chapter 11 bankruptcy on September 24, 2004 amid allegations of financial distress and accounting irregularities. Shortly thereafter, the bankruptcy court appointed an Examiner to "begin an investigation into the existence of any pre[-]petition fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management and business affairs of the Debtor." The Examiner was also instructed to "file a statement with the Court . . . reporting the preliminary or final findings of the Examiner, along with any recommendations of the Examiner for further investigation." The purpose of the investigation and the Report was to develop information for use in potential proceedings against Gitto Global.

On December 8, 2004, the Examiner filed a motion requesting that the court authorize him to submit the Report (which had not yet been filed) under seal and have it impounded pending a further order of the court. In an order dated December 9, 2004, the court allowed the motion, subject to a requirement that any

---

[1]In light of this disposition, we do not reach the claim by WT&G and MediaNews that there is a First Amendment right of public access to the full Report. See infra note 3.

party in interest be allowed to file a motion seeking release of the Report. On January 5, 2005, after receiving several motions seeking access to the Report upon its filing, the court modified its December 9 order to require that within ten days of filing the Report, the Examiner "provide each person named in the report . . . with a copy of only that portion or portions of the report that relate to the individual." The modified order also invited motions from individuals seeking to seal or redact the report, as well as objections to motions to seal or redact. The Examiner filed his Report under seal on January 7, 2004 and served redacted copies on approximately 120 individuals pursuant to the court's January 5 order.

Among those who received redacted copies of the Report were appellant Gary Gitto, part-owner and former CEO of Gitto Global, and appellant Charles Gitto, who held himself out as chairman of Gitto Global and is Gary Gitto's father. The Gittos filed motions requesting that the Report remain under seal, as did approximately twenty-four other individuals. In their motions, the Gittos argued that there was no right of public access to the Report under either the common law or the First Amendment. Gary Gitto further argued that the Report contained scandalous and defamatory material within the meaning of 11 U.S.C. § 107(b)(2), and therefore that the usual presumption of public access under § 107(a) did not apply. Appellees WT&G and MediaNews, both news

organizations, opposed the motions to seal. The appellees argued that there is a right of public access to the Report under the First Amendment, the common law, and § 107(a), and that the appellants had not demonstrated that the Report contained defamatory matter for purposes of § 107(b)(2).

On February 9, 2005, after a hearing on the various motions, the bankruptcy court concluded in a memorandum that there was nothing scandalous or defamatory in the Report. It ruled that the entire Report (with specific bank account numbers redacted pursuant to the 11 U.S.C. § 107(b)(1) exception to public access for confidential information) should be made publicly available pursuant to § 107(a) and the common law presumption of access. In light of its ruling on the statutory and common law claims, the bankruptcy court found it unnecessary to decide whether there was also a First Amendment right of public access to the Report.

Gary and Charles Gitto appealed the bankruptcy court's decision to the United States District Court for the District of Massachusetts.[2] The district court affirmed. Despite adopting a broader definition of the term "defamatory" than the bankruptcy court had used, the district court agreed that there was no basis to seal or redact the Report under § 107(b)(2) and therefore that

---

[2]Charles Gitto filed his initial motion to seal and his appeal to the district court on behalf of both himself and Tradex Corp., a corporation that he apparently owns and controls, and that was a Gitto Global creditor. Tradex Corp. is not identified as a party to this appeal, however.

§ 107(a) dictated public access.  The court also concluded that a common law analysis would lead to the same result and, like the bankruptcy court, found it unnecessary to reach the appellees' claim of a First Amendment right of access.  This appeal followed.

**II**.

The primary issue on appeal is the definition of "defamatory" as that term is used in 11 U.S.C. § 107(b)(2).  Before turning to that difficult question, however, we must describe the common law presumption of access to court filings.

**A.        Common law presumption of access**

Under the common law, there is a long-standing presumption of public access to judicial records.  See Nixon v. Warner Communications, Inc., 435 U.S. 589, 597 (1978); see also In re Boston Herald, Inc., 321 F.3d 174, 189 (1st Cir. 2003).[3]  This presumption of access "helps safeguard the integrity, quality, and respect in our judicial system, and permits the public to keep a watchful eye on the workings of public agencies."  In re Orion

---

[3]As we noted in In re Boston Herald, the Supreme Court has also "recognized a qualified First Amendment right of access to certain judicial proceedings and documents."  321 F.3d at 182.  It is unclear whether the constitutional right of access would attach to the type of document at issue in this case, namely a report filed by a bankruptcy examiner pursuant to 11 U.S.C. § 1106(a)(4)(A).  See In re Boston Herald, 321 F.3d at 182 (describing the framework for determining "if a constitutional right of access applies to particular documents").  Given our conclusion that there is a right of public access to the Report under 11 U.S.C. § 107, we need not determine whether there is also a right of public access under the First Amendment.

Pictures Corp., 21 F.3d 24, 26 (2d Cir. 1994) (internal quotation marks and citations omitted). Despite these important interests advanced by public access to judicial records, the right of access is not absolute. As the Supreme Court has recognized, "[e]very court has supervisory power over its own records and files, and access has been denied where court files might have become a vehicle for improper purposes." Nixon, 435 U.S. at 598. Courts have exercised their discretion under the common law to abrogate the right of public access where doing so was necessary to prevent judicial records from being "'used to gratify private spite or promote public scandal[,]'" id. (quoting In re Caswell, 29 A. 259 (1893)), or to prevent their records from becoming "reservoirs of libelous statements for press consumption or . . . sources of business information that might harm a litigant's competitive standing." Id. (citations omitted). Although these examples demonstrate that it is within a court's discretion to curtail the common law presumption of public access, "[o]nly the most compelling reasons can justify non-disclosure of judicial records." FTC v. Standard Fin. Mgmt. Corp., 830 F.2d 404, 410 (1st Cir. 1987) (internal quotation marks omitted).

**B.    11 U.S.C. § 107**

In the bankruptcy context, the right of public access is codified in a specific statutory provision, 11 U.S.C. § 107. Section 107, which Congress enacted in 1978, establishes a broad

right of public access, subject only to limited exceptions set forth in the statute, to all papers filed in a bankruptcy case. Specifically, 11 U.S.C. § 107(a) provides

> Except as provided in subsection (b) of this section, a paper filed in a case under [the Bankruptcy Code] and the dockets of a bankruptcy court are public records and open to examination by an entity at reasonable times without charge.

As one of our sister circuits has explained,

> [s]ection 107(a) is rooted in the right of public access to judicial proceedings, a principle long-recognized in the common law and buttressed by the First Amendment. This governmental interest is of special importance in the bankruptcy arena, as unrestricted access to judicial records fosters confidence among creditors regarding the fairness of the bankruptcy system.

In re Crawford, 194 F.3d 954, 960 (9th Cir. 1999); see also In re Bell & Beckwith, 44 B.R. 661, 664 (Bankr. N.D. Ohio 1984) ("Public scrutiny is the means by which the persons for whom the system is to benefit are able to insure its integrity and protect their rights. This policy of open inspection, established in the Bankruptcy Code itself, is fundamental to the operation of the bankruptcy system and is the best means of avoiding any suggestion of impropriety that might or could be raised."). It is thus fitting that the coverage of § 107(a) is "sweeping," see William T. Bodoh and Michelle M. Morgan, Protective Orders in the Bankruptcy Court: The Congressional Mandate of Bankruptcy Code Section 107 and Its Constitutional Implications (hereinafter Bodoh & Morgan), 24 Hastings Const. L.Q. 67, 82 (1996), extending to "all papers filed

in a bankruptcy case," H.R. Rep. No. 95-595, at 317 (1977); S. Rep.
No. 95-989, at 30 (1978) (emphasis added).

There are only two exceptions to the broad § 107(a) right
of public access, both codified in § 107(b):

> On request of a party in interest, the bankruptcy court
> shall, and on the bankruptcy court's own motion, the
> bankruptcy court may --
> (1) protect an entity with respect to a trade secret or
> confidential research, development, or commercial
> information; or
> (2) protect a person with respect to scandalous or
> defamatory matter contained in a paper filed in a case
> under [the Bankruptcy Code].

In other words, if a paper filed in bankruptcy court fits within
§ 107(b)(1) or (2), "[p]rotection is mandatory when requested by a
'party in interest.'"  2 Collier on Bankruptcy ¶ 107.03 (15th ed.
rev. 2005).[4]

Together, the two components of § 107 -- the broad right
of access created in § 107(a) and the exceptions set forth in

_____

[4]The procedure for implementing § 107(b) is set forth in Fed.
R. Bankr. P. 9018:

> On motion or on its own initiative, with or without
> notice, the court may make any order which justice
> requires (1) to protect the estate or any entity in
> respect of a trade secret or other confidential research,
> development, or commercial information, (2) to protect
> any entity against scandalous or defamatory matter
> contained in any paper filed in a case under the Code, or
> (3) to protect governmental matters that are made
> confidential by statute or regulation.  If an order is
> entered under this rule without notice, any entity
> affected thereby may move to vacate or modify the order,
> and after a hearing on notice the court shall determine
> the motion.

§ 107(b) -- create a framework for determining whether a paper filed in a bankruptcy case is available to the public or subject to protection. Absent § 107, this question would be addressed by reference to the common law. Because § 107 speaks directly to the question of public access, however, it supplants the common law for purposes of determining public access to papers filed in a bankruptcy case. See United States v. Texas, 507 U.S. 529, 534 (1993) ("In order to abrogate a common-law principle, the statute must speak directly to the question addressed by the common law." (internal quotation marks omitted)). Therefore, "issues concerning public disclosure of documents in bankruptcy cases should be resolved under § 107," In re Phar-Mor, Inc., 191 B.R. 675, 679 (Bankr. N.D. Ohio 1995), not under the common law.

### III.

For purposes of this appeal, all parties agree that the Examiner's Report is a paper filed in a bankruptcy case and that § 107 therefore governs the issue of public access to the Report.[5] See 11 U.S.C. §§ 1106(a)(4)(A), (b) (requiring an examiner to file a statement of his investigation). The parties also agree that a bankruptcy court has the power to protect a person seeking relief

---

[5]At an earlier stage of these proceedings, the appellants argued that the Report was not a "paper filed" for purposes of § 107(a) on the ground that the word "file" has a different meaning in § 107(a) than in 11 U.S.C. § 1106(a), the provision of the Bankruptcy Code under which the Examiner was obligated to "file" a statement of his investigation. The district court rejected this contention, and the appellants do not pursue it on appeal.

-11-

with regard to a public record such as the Report only when the record falls within one of the exceptions set forth in § 107(b). The issue on which they disagree is whether material in the Report falls within the § 107(b)(2) exception for "defamatory matter."[6] Resolution of that disagreement requires us to consider the meaning of the word "defamatory" as it is used in § 107(b)(2). Our review of this issue is de novo. See In re Boston Reg'l Med. Ctr., Inc., 410 F.3d 100, 108 (1st Cir. 2005) ("Like the district court, we review de novo the bankruptcy court's conclusions of law.").

## A.        The § 107(b)(2) exception

### 1. The Gittos' proposed reading of the exception

The Gittos contend that to qualify for protection under § 107(b)(2), they need only identify material that would cause a reasonable person to alter his opinion of them -- namely, in their words, material that is defamatory "[u]nder the well-established meaning of the term."  They maintain that "[n]othing in the statutory text states, or even suggests, that anything more is required."  The district court rejected this position, emphasizing that it "would sweep all manner of documents into its embrace" in

_____

[6]The § 107(b)(2) exception applies to both "scandalous" and "defamatory" matter.  On appeal, the appellants focus exclusively on the "defamatory" prong of the exception.  They do not suggest any definition for the "scandalous" prong, nor do they attempt to demonstrate that the Report is scandalous within the meaning of § 107(b)(2).  Accordingly, we focus on the "defamatory" prong as well.

contravention of the § 107(a) presumption favoring public access in the bankruptcy context.  We agree.

Although there is virtually no legislative history for § 107, the plain language of § 107(a) evinces a clear congressional intent that papers filed in bankruptcy cases be available to the public.  Many, if not the vast majority, of these papers will include material that is likely to affect an individual's reputation in the community.  Allegations of mismanagement or fraud, for example, might well cause a reasonable person to alter his opinion of the individual against whom the allegations are made.  As one bankruptcy court explained, it would be inconsistent with the presumption of public access in § 107(a) to treat such allegations as defamatory within the meaning of § 107(b)(2):

> The complaint . . . alleges that Defendants may have received fraudulent transfers. . . .    Fraudulent transfer actions . . . are common in bankruptcy practice, and to grant Defendants' motion because of this allegation could result in the sealing of pleadings in a number of adversary proceedings. Congress, in enacting section 107, did not contemplate such a result, and intended that the sealing of pleadings would be the exception rather than the rule.

Hope ex rel. Clark v. Pearson, 38 B.R. 423, 425 (Bankr. M.D. Ga. 1984).

The Gittos concede that § 107(a) reflects a congressional decision that filed papers are presumptively public and that such records are eligible for impoundment only under the specific

-13-

exceptions set forth in § 107(b). They dispute, however, the district court's conclusion that a broad reading of the exception would result in the sweeping curtailment of public access. Emphasizing that § 107(b)(2) requires the court to protect a person but does not indicate what form the protection should take, they argue that not all material falling within the § 107(b)(2) exception will necessarily be sealed. Rather, they argue, § 107(b)(2) merely triggers the court's duty to engage in a balancing of the interests as required under the common law. Based on this common law inquiry, the court would then use its discretion to take whatever protective measures justice required, whether it be sealing or a more modest form of protection.

It is true that § 107(b)(2) speaks of protection in general terms rather than of wholesale sealing, and that courts must therefore exercise some discretion in determining what form of protection to grant. It does not follow, however, that the threshold to qualify for protection under § 107(b)(2) is a low one. The Gittos acknowledge that § 107(a) reflects a legislative decision that papers filed in a bankruptcy case are public records. The reading of § 107(b)(2) that the Gittos propose, i.e., that any material tending to harm a person's reputation triggers the exception, would significantly curtail the public's access to these records. Once an interested party identifies material that is scandalous or defamatory, the court must protect the party.

-14-

Although the protection may stop short of sealing the entire document containing the defamatory material, any form of protection will limit the information available to the public. The interpretation of § 107(b)(2) advanced by the Gittos therefore remains problematic despite the seal/protect distinction that they highlight.

Moreover, there is no support for the Gittos' argument that § 107(b)(2) is merely a trigger for the traditional common law analysis regarding public disclosure. The common law requires the court to determine whether the document at issue is a "judicial record" subject to the presumption of public access, and, if so, to "balance[] the public interest in the information against privacy interests." In re Boston Herald, 321 F.3d at 190. Section 107 displaces this approach entirely. First, it dispenses with the need to determine whether the document at issue is a "judicial record" by clarifying that, in the bankruptcy context, the presumption of public access applies to any paper filed in a bankruptcy case, not only the narrower category of papers that would be considered judicial records under the common law. See id. at 180 (for purposes of the common law presumption, "[n]ot all documents filed with a court are considered judicial documents" (internal quotation marks omitted); Standard Fin. Mgmt. Corp., 830 F.2d at 412-13 ("The presumption that the public has a right to see and copy judicial records attaches to those documents which

-15-

properly come before the court in the course of an adjudicatory proceeding and which are relevant to the adjudication."). Once the presumption of public access attaches under § 107(a), the next step in the inquiry is not to engage in a balancing of the equities, as required by the common law, but rather to determine whether the material at issue falls within a specific exception to the presumption -- namely, into one of the § 107(b) categories. Finally, if material does come within one of the statutory exceptions to public access, § 107 requires a court to act at the request of an interested party -- and permits a court to act <u>sua sponte</u> -- to protect the affected party. In short, § 107 speaks directly to the issues regarding disclosure that are addressed by the common law analysis; its framework is not merely a prelude to the common law analysis. See <u>Phar-Mor</u>, 191 B.R. at 679 ("In other areas of the law, courts have relied on showings of 'compelling reasons,' or balancing the interests of privacy and public right to know, when reviewing a request for judicial non-disclosure. The mandatory language of § 107(b) negates the need for such inquiries." (citation omitted)).

In a final effort to defend their position, the Gittos assert that a reading of § 107(b)(2) that does not include a common law balancing of the equities would impermissibly infringe on the courts' traditional supervisory authority over their own records and files, <u>see</u> <u>Nixon</u>, 435 U.S. at 598, by limiting their

discretion. Such a reading, the Gittos argue, "ignores the well-established principle that, where long-standing inherent powers of a court are concerned, in the absence of 'clear and unmistakable' congressional intent to restrict them, statutes should be construed so as to preserve the district court's usual role."

As we have already discussed, § 107 limits the discretion of courts regarding public access to papers filed in a bankruptcy case by providing that all papers filed are public records (and therefore not subject to protective orders) unless material contained therein falls within one of the statutory exceptions, in which case the court "shall," on request of a party in interest, or "may," on its own motion, protect the affected party. This arrangement reflects Congress's intent to cabin the courts' authority over their records and files with regard to public access issues in bankruptcy cases. Section 107 is therefore readily distinguishable from the statute we considered in In re Atlantic Pipe Corp., 304 F.3d 135 (1st Cir. 2002), the case on which the Gittos' argument relies. In Atlantic Pipe Corp., the issue was whether the Alternative Dispute Resolution Act of 1998 ("ADR Act") restricted "the district courts' authority to engage in the case-by-case deployment of ADR procedures." Id. at 142. Emphasizing that "Congress may cabin the district courts' inherent powers [only if] its intention to do so [is] clear and unmistakable," we concluded that nothing in the ADR Act, which required judicial

-17-

districts to adopt some form of ADR procedures, could be interpreted as stripping district court judges of their inherent power to require mediation.  Id.  The statutory language of § 107, by contrast, evinces a "clear and unmistakable" intent to cabin the inherent supervisory authority of district courts over their own records and files when it comes to issues of public access to papers filed in a bankruptcy case.  We therefore reject the interpretation of § 107(b)(2) advanced by the Gittos.[7]

### 2. Our reading of the exception

Papers filed in the bankruptcy court do not fall within the § 107(b)(2) exception merely because they would have a detrimental impact on an interested party's reputation. Rather, as both the bankruptcy court and the district court determined, the statute requires something more.  The exact nature of this additional showing is not apparent, however, from the face of the statute nor from the legislative history.  See Bodoh & Morgan, 24 Hastings Const. L.Q. at 89 ("Although the class of persons covered by subsection 107(b)(2) is well defined, the type of materials constituting scandalous or defamatory matter is not.").  It is

---

[7]In light of this conclusion, we also reject the Gittos' contention that the bankruptcy court erred in failing to "make the careful balance of the interests required by the common law." Moreover, the Gittos' arguments regarding the weight to be attributed to different interests under the common law analysis are inapposite.

therefore left to the courts to determine the specific contours of the exception.

### a. Untruth vs. potential untruth

Although the bankruptcy court did not explicitly state a test for determining whether material falls within § 107(b)(2), it concluded that a party seeking to invoke the exception must "come forward with the particular facts that demonstrate the material at issue is scandalous or defamatory." In denying all of the motions for protection, the court explained that "[i]n almost all instances there was no proof" and noted that some movants "urged that the Court not divulge to the public information about them even though they do not allege that [the] information . . . is factually inaccurate." Based on these statements, the district court described the bankruptcy court as holding that "appellants, in order to enjoy the protection of § 107(b)(2), must demonstrate that material in the Report is untruthful."

The bankruptcy court's test is largely unworkable. While some parties seeking protection under § 107(b)(2) may be able to demonstrate untruthfulness solely on the basis of the papers filed with the court, such situations will be rare. More often than not, statements in a court filing are disputed. It would be unrealistic to require the bankruptcy court to resolve these factual disputes at a preliminary stage of the proceedings. The untruthfulness requirement would add an enormous burden to the bankruptcy courts'

already heavy docket by turning motions for protection under § 107(b)(2) into an occasion for mini-trials. We therefore emphasize that although a bankruptcy court may grant protection under § 107(b)(2) based on a showing of untruthfulness, protection on this basis is available only in the rare case where the untruthfulness is readily apparent. Bankruptcy courts are under no obligation to resolve questions of truthfulness presented by a § 107(b)(2) motion where doing so would require discovery or additional hearings, or would be otherwise burdensome.

In most cases, a party filing a motion for protection under § 107(b)(2) will only be able to show that the material at issue is potentially untrue. Potentially untrue material may also implicate § 107(b)(2). However, given the relative ease of showing potential untruthfulness, such a showing, standing alone, cannot be enough to trigger the exception. To hold otherwise would undermine the policy of public access codified in § 107(a). Therefore, we hold that a party may seek protection under § 107(b)(2) based on potentially untrue information that would alter his reputation in the eyes of a reasonable person. To obtain protection, however, an additional showing must be made.

b. The additional showing

The district court looked to the opinions of other courts applying § 107(b)(2) and to analogs of § 107(b)(2) to determine under what circumstances allegedly defamatory material that is

-20-

potentially untrue may trigger protection under § 107(b)(2). Finding this to be a sensible approach in dealing with a matter of first impression, we do the same.

Some courts faced with interpreting § 107(b)(2) have noted the similarity between that subsection and Fed. R. Civ. P. 12(f), which provides that "the court may order stricken from any pleading any . . . redundant, immaterial, impertinent, or scandalous matter." See Phar-Mor, 191 B.R. at 678 (tracing "[t]he authority to protect persons from scandalous or defamatory material" to Rule 26 of the Rules of Practice for the Courts of Equity of the United States, a precursor to Fed. R. Civ. P. 12(f)). Under Rule 12(f),

> scandalous allegations . . . will be stricken from the pleadings in order to purge the court's files and protect the subject of the allegations. But there are several limitations on the court's willingness to strike scandalous allegations. For example, it is not enough that the matter offends the sensibilities of the objecting party if the challenged allegations describe acts or events that are relevant to the action. As a result, courts have permitted allegations to remain in the pleadings when they supported and were relevant to a claim for punitive damages.

Hope, 38 B.R. at 424-25 (quoting 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1382 (3d ed. 2004)).

The Phar-Mor court concluded that Rule 12(f) and § 107(b) share a common premise: "A person within the courts' jurisdiction should not be subjected to scandalous or defamatory material

-21-

submitted under the guise of a properly pleaded court document." 191 B.R. at 678-79. Exceptions to the common law presumption of public access appear to share the same premise. As the Supreme Court emphasized in Nixon, under the common law, public access to court records and files "has been denied where court files might have become a vehicle for improper purposes." 435 U.S. at 598. The Court offered several examples of such "improper purposes," including gratifying public spite, promoting public scandal, and using court files as "reservoirs of libelous statements for press consumption." Id. As is the case under Rule 12(f), these bases for removing material from the public eye focus not just on the impact of the material on a person's reputation, but also on the role of the material in the court records. There is no reason to believe that the role of the material is any less central to the protection inquiry under § 107(b)(2) than it is under the Federal Rules of Civil Procedure or the common law.

The case law interpreting and applying § 107(b)(2) also supports the context-sensitive inquiry that we have just described. In re Commodore Corp., 70 B.R. 543 (Bankr. N.D. Ind. 1987), for example, involved a motion to strike portions of a brief that claimed that Lord, Bissell & Brook ("L B & B"), the court-approved counsel for the debtor, was not disinterested and therefore was not entitled to compensation and reimbursement of expenses. LB&B asserted that certain statements in the brief, including

-22-

allegations that it was "in [the] pocket" of and "a front for" another company, were scandalous or defamatory within the meaning of § 107(b)(2). 70 B.R. at 545 n.3 (internal quotation marks omitted). The bankruptcy court denied the motion, in part on the ground that "the statements in question were made in support of [the objector's] allegations that L B & B was not disinterested." Id. at 546. In other words, the court viewed the statements' relevance to a bona fide legal claim as pertinent to the § 107(b)(2) inquiry.

The decision by the district court in In re Continental Airlines, 150 B.R. 334 (D. Del. 1993) also suggests that the purpose of including material in a paper filed with the court should inform the inquiry into whether that material falls within the § 107(b)(2) exception. Continental Airlines involved the sealing of reports generated by a fee-reviewer pursuant to 11 U.S.C. § 330(a)(1)(A), which allows the court to award "reasonable compensation for actual, necessary services rendered" in a bankruptcy case. The bankruptcy court ordered that the reports be sealed pursuant to § 107(b)(2). The district court reversed, concluding that there was no evidence that the fee-reviewer's opinions and conclusions were "even potentially defamatory in nature." Id. at 340. The court explained that "[i]f such legal recommendations and assertions, required to be rendered by statutory and caselaw authority, were sealed based on nothing more

-23-

than the mere possibility that they contain 'defamatory' assertions, the judicial system would be thwarted in its mandated responsibility to supervise litigation expenses." Id. This reasoning treats the fact that the fee-reviewer's reports were statutorily-mandated as relevant to the determination that they were not scandalous or defamatory.

The Phar-Mor decision offers further support for a reading of § 107(b)(2) that is sensitive to the purpose of the statements at issue and the context in which they are made. Phar-Mor involved a complaint that alleged wrongdoing by a business entity with a general partner and several limited partners. See 191 B.R. at 677-78. Only the limited partners were named in the complaint because the general partner was protected by an automatic stay, see 11 U.S.C. § 362, but the limited partners were not. See 191 B.R. at 677. The limited partners sought to have the complaint sealed, arguing that the allegations of wrongdoing were really directed only at the general partner and that they had been named in the complaint purely for strategic reasons, including "a need to preserve some cause of action or be barred by a statute of limitations, a desire to promote settlement . . . [,] and the inability to prosecute the real party in interest, [the general partner], due to the protection of the automatic stay in his Chapter 11 case." Id. at 680. The bankruptcy court agreed, holding that "a reasonable person would alter [his] opinion of

-24-

Defendants based on a reading of the complaint, because it contains allegations of wrongdoing against the Defendants for, in essence, the acts of [the general partner], without an explanation of the underlying rationale for filing the complaint in this fashion." Id. The court's references to the strategic reasons for filing the complaint and the complaint's resulting propensity to mislead the public indicate that it considered the plaintiffs' improper reasons for filing the complaint relevant to its determination that the statements at issue were scandalous or defamatory.

In short, both the case law and the interpretation of sources analogous to § 107(b)(2) support a context-sensitive approach to the exception. We agree with the district court that "to implicate § 107(b)(2) in the context of potentially untrue material, the information would also have to be irrelevant [or] included for improper ends." Under this reading of § 107(b)(2), as Congress intended, protection of papers filed in a bankruptcy case will be "the exception rather than the rule." Hope, 38 B.R. at 425.

The district court alluded to one other category of potentially untrue material that may implicate § 107(b)(2): material that is "so misleading in context as to be deemed facially inaccurate." The court appears to have derived this category, like the improper ends test, from Phar-Mor. See 191 B.R. at 680. The district court did not explain, however, what it means for material

-25-

to be "so misleading in context as to be facially inaccurate," nor did it explicitly consider the material in the Report with reference to this standard. Having pondered this language for some time, we think its meaning is most akin to the test adopted by the bankruptcy court. Alternatively, it may just be another way of saying that material is potentially untrue. In any event, unlike the other categories set forth in the district court's thoughtful analysis, we find the category "so misleading in context as to be facially inaccurate" unhelpful. Even the material at issue in Phar-Mor, the apparent source of the "so misleading in context" standard, could also be described as triggering the § 107(b)(2) exception based on its untruthfulness or its potential untruthfulness and its inclusion in the complaint for an improper end. Hence, we will not include this category within the additional showing required by § 107(b)(2) for material that is potentially untrue.

We therefore conclude that material that would cause a reasonable person to alter his opinion of an interested party triggers the protections of § 107(b)(2) based on a showing that either (1) the material is untrue, or (2) the material is potentially untrue and irrelevant or included within a bankruptcy filing for an improper end.

**B.        Application of § 107(b)(2)**

Both the bankruptcy court and the district court concluded that the material in the Report did not fall within the § 107(b)(2) exception, and therefore that the Report had to be publicly accessible.  Although the district court made its determination based on a standard similar to the one set forth in this opinion, the bankruptcy court did not.  Specifically, the bankruptcy court did not recognize that, under certain circumstances, material that is potentially untrue, in addition to material that a court has determined to be untrue, can trigger the protections of § 107(b)(2).  The Gittos assert that if both they and the bankruptcy court misapprehended the standard for applying § 107(b)(2), they are "entitled, at the least, to the opportunity to argue for impoundment to the Bankruptcy Court under the appropriate standard [and] to point out particular problems with the Report."  As the Gittos point out, we have remanded at least once in the past to allow the court of first instance to "evaluate the plaintiffs' complaints in light of the standard [announced on appeal]." Agosto-de-Feliciano v. Aponte-Roque, 889 F.2d 1209, 1223 (1st Cir. 1989) (en banc).

We conclude, however, that there is no need for a remand in this case because "application of the correct legal standard could lead to only one conclusion." Ward v. Comm'r, 211 F.3d 652, 656 (1st Cir. 2000) (quoting Schaal v. Apfel, 134 F.3d 496, 504 (2d

-27-

Cir. 1998)); see also In re R & R Assocs. of Hampton, 402 F.3d 257, 270 (1st Cir. 2005) (explaining that "[w]e have considered remanding the case to the district and bankruptcy courts for further factfinding . . . but see no need to impose . . . on the courts' time" because, based on the record, "no reasonable factfinder" could disagree as to the result). At most, the material in the Report is potentially untrue. Potentially untrue statements are defamatory within the meaning of § 107(b)(2) only if they are also irrelevant or included for improper ends. The contents of the Report do not meet this standard.

## 1. Untruthfulness

The bankruptcy court concluded that the parties seeking protection under § 107(b)(2) had not provided proof that any of the material in the Report is inaccurate. The Gittos do not directly challenge that ruling on appeal. Instead, as will usually happen in these § 107(b)(2) cases, the Gittos' criticism demonstrates only that some material in the Report is potentially untrue. For example, the Gittos assert that "[o]ne of the greatest problems with the Report is the way the Examiner attributes wrongdoing to the 'Gitto [P]rincipals,' a group including more than Charles and Garry Gitto, while conceding that he cannot 'allocate [blame] precisely among the three [principals].'" The Gittos also complain that "some of the harshest allegations against [them] are highly misleading in that there is a sharp disconnect between the evidence

-28-

collected by the Examiner and the sweeping conclusions he is willing to advance." These contentions do not establish that the Report is untrue, nor would they obligate a bankruptcy court to engage in additional factfinding on the issue. They demonstrate only that material in the Report may later turn out to be untrue, a point which is beyond dispute in light of the acknowledgment in the Report that "[c]ontinued investigation may lead to evidence which supports or contradicts . . . statements [herein]." Given this caveat and the preliminary nature of the Report, we will assume, as did the district court, that the Report includes potentially untrue material that would cause a reasonable person to alter his opinion of the Gittos.

### 2. Irrelevance or inclusion for improper ends

Material that is potentially untrue and that would cause a reasonable person to alter his opinion of an interested party triggers the protections of § 107(b)(2) if it is also irrelevant to the case in which it was filed or if it is included within a filing for improper ends. Neither of those circumstances is present here.

### a. Irrelevance

The bankruptcy court appointed the Examiner pursuant to 11 U.S.C. § 1104(c), which contemplates an examiner "conduct[ing] such an investigation of the debtor as is appropriate, including an investigation of any allegations of fraud, dishonesty,

-29-

incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor." Over the three months following his appointment, the Examiner engaged in an extensive investigation of pre-petition irregularities and misconduct. As the Examiner -- an appellee in this case -- relates in his brief, he "interviewed dozens of witnesses, reviewed thousands of pages of documents, and prepared a Report running more than 150 pages." See 11 U.S.C. § 1106(a)(4)(A) (requiring the Examiner to file a statement of his investigation).

The Report catalogs precisely the types of allegations described in 11 U.S.C. § 1104(c) -- namely, "irregularit[ies] in the management of the affairs of the debtor [Gitto Global] of or by . . . former management of the debtor."[8] Id. While these allegations may affect the reputations of those at whom they are directed, that possibility, standing alone, does not render them defamatory within the meaning of § 107(b)(2). The information in the Report is directly relevant to the Report's purpose, which the Examiner describes in his brief as creating "a base of information sufficient [for creditors] to assess whether they may have claims against management, shareholders, or others who have worked with

---

[8]All of Gitto Global's officers and directors resigned and were replaced by an independent restructuring officer immediately before the company filed for bankruptcy. All of the pre-petition activity described in the Report therefore involves only former management.

-30-

the corporation." The fact that the Report will be used by creditors and shareholders to assess their claims, rather than by the court to adjudicate a dispute, does not make the material included therein any less relevant to the bankruptcy case. The relevancy of the material in the Report is similarly unaffected by the fact that the Report discusses pre-petition conduct, as opposed to ongoing conduct. As the district court recognized, "the avenues a debtor may pursue to recover for arguably improper activity by its former officers and their associates remains of concern to the mission of the bankruptcy court." (Emphasis added.)

b. Improper ends

The question of whether the potentially untrue material was included for an improper end is also no help to the Gittos' § 107(b)(2) claim. The Examiner's disinterested status in this case is not in question, nor is there any indication whatsoever that he drafted the Report in bad faith or otherwise included the allegedly defamatory material for an improper purpose. Cf. Phar-Mor, 191 B.R. at 679-80 (concluding that a complaint that was filed for "strategic reasons which would not be apparent[] on its face" fell within the § 107(b)(2) exception).

The Gittos therefore cannot show that potentially untrue material in the Report is either irrelevant or included for an

-31-

improper end.  Therefore, the bankruptcy court did not err in denying their request for protection under § 107(b)(2).[9]

## IV.

To qualify for protection under the § 107(b)(2) exception for defamatory material, an interested party must show (1) that the material at issue would alter his reputation in the eyes of a reasonable person, and (2) that the material is untrue or that it is potentially untrue and irrelevant or included for an improper end.  The Gittos cannot make such a showing with regard to the Report.  Therefore, upon issuance of the mandate, and once the Examiner deletes all bank account numbers included in the Report and its exhibits pursuant to the unchallenged ruling of the

---

[9]In concluding that there is a right of public access to the Report, we also reject the Gittos' argument that public disclosure of the Report will "create a genuine risk" of harm to their Sixth Amendment right to trial by an impartial jury.  Although the Gittos emphasize that a federal grand jury is investigating "the same matters investigated by the Examiner," they have not indicated that any criminal charges have been filed in connection with the grand jury's investigation, much less that a trial is imminent. Concerns that disclosure of the Report would taint a jury pool are therefore entirely speculative.  Moreover, there are many ways to protect a criminal defendant's right to a fair trial without enjoining the public disclosure of information. For example, a court may use the voir dire process to "identify those jurors whose prior knowledge of the case would disable them from rendering an impartial verdict," Press-Enterprise Co. v. Superior Court, 478 U.S. 1, 15 (1986), or transfer the proceeding to a different venue, see Fed. R. Crim. P. 21(a).  In light of these alternatives and the highly speculative nature of the Gittos claim, the Sixth Amendment does not require sealing or redaction of the Report.

bankruptcy court regarding the redaction of confidential information, the Report shall be filed publicly.

**So ordered.** **Judgment affirmed.**