# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

In the Matter of: ROMAN CATHOLIC
ARCHBISHOP OF PORTLAND IN
OREGON, as Successors, a
Corporation Sole, DBA
Archdiocese of Portland in
Oregon,

FATHER M; FATHER D,
                    *Appellants,*

            v.

VARIOUS TORT CLAIMANTS,
                    *Appellee.*

No. 10-35206

D.C. No.
6:09-cv-01396-AA

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the District of Oregon
Ann L. Aiken, Chief District Judge, Presiding

Argued and Submitted
May 4, 2011—Portland, Oregon

Filed September 21, 2011
Amended November 7, 2011

Before: Alex Kozinski, Chief Judge, Carlos T. Bea and
Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Ikuta

19993

**COUNSEL**

Natalia Yegorova, Black Helterline LLP, Portland, Oregon, for appellants Father M and Father D.

Erin K. Olson, Law Office of Erin Olson, P.C., Portland, Oregon, for appellee Various Tort Claimants.

**ORDER**

The opinion filed September 21, 2011, is amended as follows:

> *At Slip Op. 17922, line 1*: Change "names" to "identity"
>
> *At Slip Op. 17922, line 3*: Change "name" to "identifying information"

*At Slip Op. 17922, line 5*: Change "name" to "identifying information"

*At Slip Op. 17929, lines 22-23*: Change " the names of Fathers M and D" to "Fathers M and D's identifying information"

*At Slip Op. 17929, line 24*: Change "name" to "identifying information"

*At Slip Op. 17929, lines 24-25*: Change "(but not Father M's name)" to "(but not Father M's)"

*At Slip Op. 17930, line 20*: Change both instances of "name" to "identifying information"

With these amendments, the panel has voted to deny Appellant Father D's Petition for Panel Rehearing filed on October 5, 2011.

The panel has voted to deny Appellant Father M's motions and alternative motions filed on October 5, 2011. This denial is without prejudice to Father M's bringing a motion in the district court, under Rule 60 of the Federal Rules of Civil Procedure, for relief from the bankruptcy court's order in light of our opinion, as amended by this order. The district court is hereby directed to consider and rule on any such promptly filed motion before remanding this case to the bankruptcy court.

The panel has voted to deny Appellee's Petition for Rehearing En Banc filed on October 5, 2011.

No further filings shall be accepted in this case.

**OPINION**

IKUTA, Circuit Judge:

Documents produced in discovery and filed in the bankruptcy court contained allegations that Fathers M and D, two priests who were not parties to the Portland Archdiocese's bankruptcy case, had sexually abused children. The bankruptcy court held that the discovery documents at issue could be disclosed to the public, because the public's interest in disclosure of these discovery documents outweighed the priests' privacy interests under Rule 26(c) of the Federal Rules of Civil Procedure. It also held that the documents filed in court could be disclosed to the public because they did not contain "scandalous" allegations for purposes of 11 U.S.C § 107(b). The district court affirmed. We affirm in part and reverse in part.

I

The Portland Archdiocese was the subject of multiple lawsuits seeking millions of dollars in compensatory and punitive damages for sexual abuse of children by specific clergy members of the Archdiocese. In July 2004, while the tort claimants' lawsuits were pending, the Archdiocese filed for Chapter 11 bankruptcy protection. The bankruptcy case thus became the forum for many of the proceedings relating to the tort claims.[1] The appellees (referred to here as Appellee Claimants) are a small subset of the many tort claimants who were parties to the bankruptcy case.[2]

---

[1]Subject to certain exceptions, "all proceedings that arise during the case are to take place before the bankruptcy court." *Collier on Bankruptcy* ¶ 3.02[2] (16th ed. rev. 2011). A bankruptcy court is not, however, authorized to determine the amount of damages awarded in a tort lawsuit; that duty is entrusted only to the district court. *See* 28 U.S.C. § 157(b)(1), (5).

[2]There are about two dozen Appellee Claimants out of over 140 tort claimants.

After the Chapter 11 filing, the bankruptcy court scheduled mediation to give the tort claimants and the Archdiocese an opportunity to settle the tort claims. Before mediation commenced, the tort claimants sought discovery regarding their claims pursuant to Rule 26 of the Federal Rules of Civil Procedure (which is made applicable to bankruptcy proceedings by Federal Rule of Bankruptcy Procedure 7026). In order to prove that the Archdiocese had engaged in a pattern and practice of misconduct, the tort claimants sought discovery regarding, among other things, all reports of sexual abuse by priests within the Archdiocese, not just reports regarding the priests who were the defendants in the tort suits.

The bankruptcy court entered two orders governing premediation discovery, both dated January 14, 2005. The first order directed the Archdiocese to produce the personnel files of 37 accused priests identified by the Archdiocese for the "John Jay Study," a national study of clergy abuse commissioned by the United States Conference of Catholic Bishops, and to make available four officials for deposition. Second, the court entered a stipulated protective order, which had been negotiated between the Archdiocese and the tort claimants. Relevant here, paragraph 7 of the protective order provided as follows:

> In the event that tort claimants wish to remove from the restrictions of this order any document designated as "Confidential" by Debtor pursuant to this order, tort claimants shall provide prior written notice to Debtor's counsel and counsel for the priest whose file is at issue, if any. Counsel shall then have seven (7) days to file a motion with the court seeking an order preventing the disclosure of such document. The document or documents shall remain subject to this order unless the court rules otherwise following the filing of counsel's motion.

The protective order allowed the Archdiocese to designate "any and all documents produced pursuant to the [first discovery] order" as confidential.

Among the documents disclosed pursuant to the bankruptcy court's discovery order were the personnel files of Father M and Father D. The Archdiocese produced these files only because their names were included in the John Jay Study; neither had been sued by the tort claimants. Father M, 72 years old, had left Portland in 2000 or 2001, and Father D, 88 years old, had retired in 1989. Neither was notified about the parties' negotiation of the discovery order, nor that their files had been disclosed. Their personnel files, along with the others, were filed under seal in the bankruptcy case.

During 2007, the Archdiocese and the tort claimants engaged in negotiations regarding both the damage claims and the scope of disclosure of documents produced in the bankruptcy filing.

In connection with the negotiations to settle the damage claims, the Appellee Claimants filed a memorandum on March 6, 2007, which "summarize[d] the pattern and practice evidence and the punitive damages evidence in support of the estimation" of five unresolved tort claims. The memorandum included, as attachments, the clergy personnel files of 27 priests (including Father M and Father D), plus deposition excerpts and other documents. These documents were filed under seal pursuant to the court's protective order. The tort claimants (including the Appellee Claimants) settled most of the claims against the Archdiocese.

While these settlement talks were underway, the parties also negotiated the scope of release of bankruptcy documents. Counsel for several tort claimants (but not Appellee Claimants) invoked paragraph 7 of the protective order, notifying the Archdiocese of their intent to release some 1,760 pages of material that were produced by the Archdiocese in discovery

as well as deposition transcripts. As was their right under the protective order, the Archdiocese and nine individual priests moved the bankruptcy court to prevent the release of the discovery material. The parties entered into a new round of negotiations regarding which sealed documents would be made public. Fathers M and D were not part of these negotiations. On May 24, 2007, counsel for the tort claimants informed the bankruptcy court that the parties had agreed to a resolution. As a result of this agreement, the Archdiocese released over 2,000 documents and posted them to a public website. This resolution did not bind Appellee Claimants.

On September 28, 2007, the bankruptcy court closed the Archdiocese's Chapter 11 case, retaining jurisdiction over any pending adversary proceedings. The conclusion of the Archdiocese's bankruptcy proceedings did not, however, resolve whether there would be public disclosure of documents designated as confidential or filed under seal. As noted above, Appellee Claimants were not bound by the May 24, 2007 mediation agreement, and they filed a motion to unseal the punitive damage estimation memorandum and exhibits filed as part of the successful negotiations to settle the tort claims. Appellee Claimants also notified the Archdiocese that they intended to release all personnel records from the clergy files that were produced in discovery. The Archdiocese opposed the Appellee Claimants' motion to unseal the court documents and also sought an order preventing the disclosure of the discovery documents. A number of priests whose files stood to be released, including Fathers M and D, filed similar motions.

After a hearing in which counsel for Fathers M and D participated, the bankruptcy court ruled in favor of the Appellee Claimants. The court first considered the personnel records produced in discovery. Applying Rule 26(c),[3] the court con-

---

[3]Rule 26(c) of the Federal Rules of Civil Procedure provides, in pertinent part:

cluded that the Archdiocese had not demonstrated "good cause" sufficient to overcome the presumption of public access to the names of and allegations against the accused clergy, although there was good cause to redact the addresses, social security numbers, financial information, and family information of those priests. This ruling applied with equal force to the personnel files of Fathers M and D. The bankruptcy court also considered the Appellee Claimants' motion to make public certain deposition transcripts and attached exhibits, and held that even if these documents were covered by the protective order, no party had opposed the Appellee Claimants' motion or shown good cause to continue any protection. Accordingly, the court also permitted their release.

Second, the court considered whether 11 U.S.C. § 107[4] pre-

---

**(c) Protective Orders.**

(1) **In General.** A party or any person from whom discovery is sought may move for a protective order in the court where the action is pending—or as an alternative on matters relating to a deposition, in the court for the district where the deposition will be taken. The motion must include a certification that the movant has in good faith conferred or attempted to confer with other affected parties in an effort to resolve the dispute without court action. The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following:

(A) forbidding the disclosure or discovery . . . .

[4]11 U.S.C. § 107 provides, in pertinent part:

(a) Except as provided in subsections (b) and (c) and subject to section 112, a paper filed in a case under this title and the dockets of a bankruptcy court are public records and open to examination by an entity at reasonable times without charge.

(b) On request of a party in interest, the bankruptcy court shall, and on the bankruptcy court's own motion, the bankruptcy court may . . .

(2) protect a person with respect to scandalous or defamatory matter contained in a paper filed in a case under this title.

cluded the release of attachments to the Appellee Claimants' punitive damage estimation memorandum that had been filed with the court. The priests argued that the personnel files attached to the memorandum contained "scandalous" materials, and thus qualified for the exception to disclosure in § 107(b). The bankruptcy court rejected this argument. It defined the word "scandalous" to mean a document that "improperly casts a derogatory light on someone," and determined that the Appellee Claimants were not using the personnel files for an improper purpose. Therefore, it ordered the release of these files.

Fathers M and D appealed the bankruptcy court's order to the district court. The district court affirmed, and Fathers M and D timely appealed. The bankruptcy court stayed the order pending the outcome of this appeal.

We review the district court's decision on appeal from a bankruptcy court de novo, giving no "deference to the district court's determinations." *In re Mantz*, 343 F.3d 1207, 1211 (9th Cir. 2003) (quoting *Batlan v. TransAm. Commercial Fin. Corp.*, 265 F.3d 959, 963 (9th Cir. 2001) (internal quotation marks omitted).

## II

We first consider the bankruptcy court's ruling under Rule 26 of the Federal Rules of Civil Procedure allowing the release of Fathers M and D's personnel files, which were produced during discovery but not filed with the court.

## A

"We review a lower court's decision to grant, lift or modify a protective order for abuse of discretion." *Phillips v. Gen. Motors Corp.*, 307 F.3d 1206, 1210 (9th Cir. 2002). A court abuses its discretion when it fails to identify and apply "the correct legal rule to the relief requested," *United States v.*

*Hinkson*, 585 F.3d 1247, 1263 (9th Cir. 2009) (en banc), or if its application of the correct legal standard was "(1) 'illogical,' (2) 'implausible,' or (3) without 'support in inferences that may be drawn from the facts in the record,' " *id.* at 1262 (quoting *Anderson v. City of Bessemer*, 470 U.S. 564, 577 (1985)). We review the bankruptcy court's findings of fact for clear error and its conclusions of law de novo. *In re Craig*, 579 F.3d 1040, 1044 (9th Cir. 2009).

**[1]** As a general rule, the public is permitted "access to litigation documents and information produced during discovery." *Phillips*, 307 F.3d at 1210; *see also San Jose Mercury News, Inc. v. U.S. Dist. Court*, 187 F.3d 1096, 1103 (9th Cir. 1999) ("It is well-established that the fruits of pretrial discovery are, in the absence of a court order to the contrary, presumptively public."). Under Rule 26, however, "[t]he court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c)(1). The party opposing disclosure has the burden of proving "good cause," which requires a showing "that specific prejudice or harm will result" if the protective order is not granted. *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1130 (9th Cir. 2003).

While courts generally make a finding of good cause before issuing a protective order, a court need not do so where (as here) the parties stipulate to such an order. When the protective order "was a stipulated order and no party ha[s] made a 'good cause' showing," then "the burden of proof . . . remain[s] with the party seeking protection." *Phillips*, 307 F.3d at 1211 n.1. If a party takes steps to release documents subject to a stipulated order, the party opposing disclosure has the burden of establishing that there is good cause to continue the protection of the discovery material.

A court considering a motion for a continuation of the protective order must proceed in two steps. First, it must deter-

mine whether "particularized harm will result from disclosure of information to the public." *Id.* at 1211. As we have explained, "[b]road allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not satisfy the Rule 26(c) test." *Beckman Indus., Inc. v. Int'l Ins. Co.*, 966 F.2d 470, 476 (9th Cir. 1992) (quoting *Cipollone v. Liggett Group, Inc.*, 785 F.2d 1108, 1121 (3rd Cir.1986)) (internal quotation marks omitted). Rather, the person seeking protection from disclosure must "allege specific prejudice or harm." *See id.* Second, if the court concludes that such harm will result from disclosure of the discovery documents, then it must proceed to balance "the public and private interests to decide whether [maintaining] a protective order is necessary." *Phillips*, 307 F.3d at 1211. We have directed courts doing this balancing to consider the factors identified by the Third Circuit in *Glenmede Trust Co. v. Thompson*, 56 F.3d 476, 483 (3d Cir. 1995).[5] *See Phillips*, 307 F.3d at 1211.

But even when the factors in this two-part test weigh in favor of protecting the discovery material (i.e., where the court determines that disclosure of information may result in "particularized harm," and the private interest in protecting the discovery material outweighs the public interest in disclosure), a court must still consider whether redacting portions of the discovery material will nevertheless allow disclosure. *Foltz*, 331 F.3d at 1136-37. In *Foltz*, an insurer argued that

---

[5]Those factors are:

> (1) whether disclosure will violate any privacy interests; (2) whether the information is being sought for a legitimate purpose or for an improper purpose; (3) whether disclosure of the information will cause a party embarrassment; (4) whether confidentiality is being sought over information important to public health and safety; (5) whether the sharing of information among litigants will promote fairness and efficiency; (6) whether a party benefitting from the order of confidentiality is a public entity or official; and (7) whether the case involves issues important to the public.

*Glenmede Trust*, 56 F.3d at 483.

documents produced in discovery "contained confidential information that would satisfy the 'good cause' standard of Rule 26(c)," *id.* at 1131, such as "confidential financial information, third-party medical records, personnel files, and trade secrets," *id.* at 1136. Based on our review of the record, we concluded that "the limited number of third-party medical and personnel records [could] be redacted easily to protect third-party privacy interests while leaving other meaningful information." *Id.* at 1137.

**[2]** Accordingly, in determining whether to protect discovery materials from disclosure under Rule 26(c), a court must not only consider whether the party seeking protection has shown particularized harm, and whether the balance of public and private interests weighs in favor, but also keep in mind the possibility of redacting sensitive material.

B

In light of these principles, we now turn to Fathers M and D's argument that the bankruptcy court erred in rejecting their motion under Rule 26(c) to protect their personnel files from disclosure. The priests raise two different arguments: first, that the bankruptcy court should have presumed that they had good cause to protect their personnel files from disclosure, because they were not sued and had not intervened; and second, even if they were not relieved of the burden of proving good cause, they had carried that burden, and the bankruptcy court erred in concluding otherwise. We address their arguments in turn.

1

We begin by considering Fathers M and D's request that we develop a new rule governing the disclosure of discovery material containing confidential information about third parties. First, the priests assert that the types of personnel files at issue raise privacy concerns that are appropriately subject to

protective orders, particularly with respect to third parties. *See Foltz*, 331 F.3d at 1130*; Knoll v. AT&T*, 176 F.3d 359 (6th Cir. 1999) (upholding a protective order limiting plaintiffs' access to the personnel files of non-party AT&T employees). Given the likelihood that third parties may not be notified when their confidential information is at risk of being disclosed by a defendant (such as an employer, hospital, or computerized data management company), Fathers M and D propose that we adopt a presumption of good cause to forbid disclosure of third party records, which the party seeking disclosure would have to rebut. According to Fathers M and D, the justification for such a rule is even stronger when modification is sought after a case has settled, by which point only the non-parties whose private information is at risk have a stake in the proceedings.

**[3]** Although this argument is not without merit, we decline to adopt the priests' proposed rule because it is not consistent with the language of Rule 26(c)(1) or our precedent. As noted above, Rule 26(c) provides that "[t]he court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense" by, among other things, "forbidding the disclosure" of discovery material. Fed. R. Civ. P. 26(c)(1). We have consistently read this language against the background principle that material produced in pretrial discovery is "presumptively public," *San Jose Mercury News*, 187 F.3d at 1103, and held that this presumption can be rebutted only by a showing of good cause by the one seeking protection, *Phillip*, 307 F.3d at 1210-11 (holding that the party or intervenor "seeking protection bears the burden of showing specific prejudice or harm will result if no protective order is granted"). *See Beckman*, 966 F.2d at 475. Under Rule 26(c)(1), the one seeking protection may be either a "party" or a "person." Fed. R. Civ. P. 26(c)(1). The plain meaning of the word "person" would include third parties who are not part of the litigation. Thus, we cannot logically exclude third parties from our

rule that whoever is seeking protection under Rule 26(c) bears the burden of showing good cause.

**[4]** Our reading is supported by the observation that the drafters of the Federal Rules of Civil Procedure knew how to vary from the general rule that discovery material is presumptively public when they wanted to. Thus, Rule 5.2 provides that "[u]nless the court orders otherwise," and subject to certain exemptions inapplicable to third parties, an "electronic or paper filing with the court" may include only "(1) the last four digits of [a person's] social-security number and taxpayer-identification number; (2) the year of the individual's birth; (3) [a] minor's initials; and (4) the last four digits of the financial-account number." Fed. R. Civ. P. 5.2(a). While Rule 5.2 makes certain types of confidential information presumptively confidential, nothing in Rule 26(c), or any other rule, suggests a similar intent by the drafters to presume confidentiality of all sensitive information about third parties. Thus, we decline to fashion such a rule.

2

We now turn to Fathers M and D's second argument, that the bankruptcy court erred in concluding that there was not good cause to protect their personnel files from disclosure. As noted above, the good cause analysis proceeds in three steps.

**[5]** First, a bankruptcy court must consider the evidence of particularized harm resulting from disclosure. The priests submitted the following evidence of the "specific prejudice or harm" that will result if their personnel files are disclosed. Father M stated that no claims were made against him in the bankruptcy proceeding, but if his name "is associated with the Archdiocese bankruptcy proceeding and settlements in any way, people will assume [he] was guilty of wrongdoing." Because of the seriousness of the allegations, and because people will not "move forward and regain their trust" in the priests involved in the matter, Father M concluded that "if my

name is released in connection with this case[,] I honestly think my career and life will be ruined."

In a June 2008 declaration, Father D stated that he was currently 85 years old, and had retired in August 1989 due to severe depression. Further, he stated that "[n]o person has ever filed a claim of sexual abuse against me or demanded any settlement from the Archdiocese as a result of something I allegedly did or did not do." And he made clear that as a retiree, he did not want the "public attention and humiliation" that would result from being associated with the Archdiocese child sex abuse settlements. Father D concluded that publication of his name "would ruin my reputation amongst my friends, family and community," and "cause me to lose my residence where, as a retired priest, I can live the remainder of my life." Finally, he stated that "I fear the stress caused from being associated with this matter would be extremely detrimental to my health."

[6] The bankruptcy court here did not directly address whether Fathers M and D had shown a particularized harm resulting from disclosure. We may, however, infer that it implicitly determined that the priests did carry their burden of showing such a harm, because otherwise it would not have proceeded to balance private and public interests. *See Phillips*, 307 F.3d at 1211. In any event, given the priests' declarations regarding the harm they would experience should their names be associated with the Archdiocese bankruptcy and settlement, including public humiliation, loss of career (in the case of Father M), and possible eviction from a retirement home (in the case of Father D), a finding that these priests did not show particularized harm would have been "illogical, implausible, or without support in inferences that may be drawn from the facts in the record." *Hinkson*, 585 F.3d at 1263.

[7] Accordingly, we proceed to the second step, namely, whether the balance of public and private interests weighed in favor of the priests' interest in confidentiality. Here, the bank-

ruptcy court concluded that Fathers M and D's "desire to be protected from scandal does not demonstrate a clearly defined and serious injury outweighing the public interest necessary to establish good cause." The bankruptcy court reasoned that although no claims of misconduct had been filed against the priests in the bankruptcy case, the personnel files established that "there were credible allegations of abuse made." According to the court, allegations against Father M had been brought to the attention of the district attorney, who did not prosecute because the statute of limitations had run. Further, the court noted that allegations had been made against Father M in a newspaper article posted on a public website. Turning to Father D, the court noted that he had admitted misconduct to the Archbishop, and that his name appeared on the exhibit list for the Archbishop's deposition, which had been posted on a public website.

[8] While the bankruptcy court did not expressly identify the public and private interests, we infer that it concluded that the private interest was small, given that Fathers M and D's names had both been publicly disclosed, and that the public interest was large due to the credibility of the allegations of misconduct. The Appellee Claimants provide additional arguments regarding the public interest in disclosure of Fathers M and D's personnel files. Specifically, they argue that the public has an interest in identifying sexual abusers of children, particularly those occupying positions of power and trust; public safety; giving other victims comfort from knowing they are not alone; and exposing church officials' knowledge of the rampant abuse.

[9] Thus, we must now consider whether the bankruptcy court abused its discretion in determining that the balance between public and private interests weighed in favor of disclosure. We first note that the mere allegation of misconduct in the discovery documents filed in this case, without more, does not create a public interest sufficiently large to outweigh the priests' private interests in confidentiality. There has been

no judicial determination regarding the truth of the allegations against Fathers M and D, and neither priest has been given an opportunity to put on evidence, provide argument, or otherwise litigate the allegations either in the bankruptcy court or elsewhere. Second, given the nature of the allegations, the private interest in confidentiality is significant, and it is not eviscerated by a small number of public disclosures of a third party's name. Indeed, we recently held that even after accurate confidential information has been disclosed in national newspapers, the subjects of such leaked confidential data retained their interests in preventing further disclosures. *See United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162, 1174 (9th Cir. 2010) (en banc) (holding that the court did not abuse its discretion in concluding that "equitable considerations" required sequestration and the return of copies of illegally seized evidence, even though some professional baseball players' positive drug tests had already been reported in the *New York Times* and other newspapers).

**[10]** The public does, however, have a weighty interest in public safety and in knowing who might sexually abuse children. *See New York v. Ferber,* 458 U.S. 747, 756-63 (1982) (recognizing the government's compelling interest in "safeguarding the physical and psychological well-being" of children, such as by preventing sexual abuse). Although the bankruptcy court did not mention this reason, we may affirm on any ground supported by the record, even if not relied upon by the bankruptcy court or district court. *See Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1062 (9th Cir. 2001). The record reflects that Father M is not retired but continues to work as a priest in his community, where his clerical duties may bring him into contact with children. In light of this evidence, we cannot say the bankruptcy court's conclusion as to Father M is "illogical, implausible, or without support in . . . the record." *Hinkson*, 585 F.3d at 1263.

This public safety concern is not applicable to Father D, however. Father D has been retired for many years, and noth-

ing in the record indicates that he continues working in the community. Nor is it clear that the other public interests identified by the Appellee Claimants, namely comforting victims of abuse and exposing church officials, outweigh Fathers D's privacy interests.

**[11]** But even assuming that they do, we must still consider the third step in the good cause analysis, the question of redaction. Fathers M and D argue that redacting their identifying information, as we did in *Foltz*, would not undermine the interests identified by Appellee Claimants. We agree as to Father D: victims can know that they are not alone, and church officials' complicity in the abuse can be revealed, without disclosing the identity of accused priests. By contrast, the public safety concern discussed above cannot be satisfied if Father M's identifying information is redacted. We therefore hold that the bankruptcy court abused its discretion in declining to redact Father D's identifying information from the personnel files, but we uphold the court's decision as to Father M.

## III

**[12]** We now turn to Fathers M and D's argument that the bankruptcy court erred in unsealing the punitive damage estimation memorandum and the attached documents concerning Fathers M and D that were filed in bankruptcy court.[6] The

---

[6]The Appellee Claimants argue that Fathers M and D waived the issue of the bankruptcy court's application of § 107 by failing to raise it before the district court. In the bankruptcy context, we may entertain arguments not raised before the district court "when the issue is one of law and either does not depend on the factual record, or the record has been fully developed." *In re Am. W. Airlines, Inc.*, 217 F.3d 1161, 1165 (9th Cir. 2000) (considering an issue of statutory construction raised in the bankruptcy but not the district court). Because Fathers M and D's "argument is a matter of statutory construction," the record "has been fully developed," and Appellee Claimants were able to brief the issue (and thus, will suffer no prejudice), we exercise our discretion to address it. *Id.*

determination as to whether to release documents filed with the court is governed by 11 U.S.C. § 107(a), which establishes a general right of public access to bankruptcy filings. It states broadly that "a paper filed in a case under this title and the dockets of a bankruptcy court are public records." 11 U.S.C. § 107(a). This general rule is subject to exceptions, however, including the one invoked by Fathers M and D here: "On request of a party in interest, the bankruptcy court shall . . . protect a person with respect to scandalous or defamatory matter contained in a paper filed in a case under this title." 11 U.S.C. § 107(b)(2).

For its part, the bankruptcy court held that the documents attached to the tort claimants' punitive damage estimation memorandum were not "scandalous" matter for purposes of § 107(b),[7] and therefore did not constitute an exception to the general right of public access established by § 107(a). Relying on two out-of-circuit cases, *In re Gitto Global Corp.*, 422 F.3d 1 (1st Cir. 2005), and *In re Neal*, 461 F.3d 1048 (8th Cir. 2006), the court held that materials were "scandalous" if they were likely to cause a reasonable person to alter his or her opinion of the priests, and were either "untrue" or "potentially untrue and irrelevant or included within a bankruptcy filing for an improper end." Fathers M and D argue that the bankruptcy court erred in construing the word "scandalous" in this manner, and thus erred in ruling that the § 107(b) exception was inapplicable to them. We review the bankruptcy court's interpretation of a statute de novo. *In re Cellular 101, Inc.*, 377 F.3d 1092, 1095 (9th Cir. 2004).

### A

Before we address Fathers M and D's argument based on their interpretation of the statutory language of § 107(b), we must address the parties' arguments as to whether the statute

---

[7]On appeal, Fathers M and D do not claim that the material is defamatory, so we do not consider that exception.

supplants the common law right of public access to judicial documents. At common law, there is a "strong presumption in favor of access" to information filed with a court. *Kamakana v. City and Cnty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006) (quoting *Foltz*, 331 F.3d at 1135) (internal quotation marks omitted). To overcome the presumption, a party seeking to seal a judicial record must demonstrate not just "good cause," but "compelling reasons," *Foltz*, 331 F.3d at 1135-36, or "sufficiently important countervailing interests," *Phillips*, 307 F.3d at 1212. Generally speaking, compelling reasons exist when court records "might have become a vehicle for improper purposes," such as to gratify private spite, promote public scandal, commit libel, or release trade secrets. *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598 (1978).

There is, however, a narrow exception to the presumption in favor of access for documents that were (1) subject to a protective order issued by a court pursuant to a finding of good cause, and (2) attached to non-dispositive motions. *Phillips*, 307 F.3d at 1213. In such a case, the burden is on the party seeking disclosure to "present sufficiently compelling reasons why the sealed discovery document should be released."[8] *Id.* We have not yet ruled on whether discovery documents subject to a *stipulated* protective order and attached to a non-dispositive motion, as in this case, fall within this exception.

**[13]** We need not address this novel issue, however, because we conclude that this common law right is not applicable here. Although § 107(a) addresses the same public access right as the common law, our comparison of common law principles with the statute leads us to conclude that § 107 displaces the common law right of access in the bankruptcy

---

[8]For all other documents (i.e., those attached to "dispositive pleadings, including motions for summary judgment and related attachments"), the "strong presumption of access to judicial records applies fully." *Kamakana*, 447 F.3d at 1179.

context. A statutory provision abrogates a well-established common law rule if it "speak[s] directly to the question addressed by the common law," *United States v. Texas*, 507 U.S. 529, 534 (1993) (internal quotation marks omitted), and indicates a statutory purpose not to apply the common law, *see id.* ("[C]ourts may take it as a given that Congress has legislated with an expectation that the [common law] principle will apply except when a statutory purpose to the contrary is evident." (quoting *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991) (internal quotation marks omitted)). A "statutory purpose to the contrary is evident" when there is a divergence between the statute's direction and the common law. Thus, for example, in *In re Hanford Nuclear Reservation Litigation*, we held that a statute compensating victims of nuclear incidents and indemnifying contractors was contrary to, and therefore abrogated, the common law "government contractor defense," which exempted contractors from liability for design defects in military equipment only under limited circumstances. 534 F.3d 986, 1000-02 (9th Cir. 2008).

We perceive such a divergence between § 107 and the common law. The statute speaks directly to, and diverges from, the common law right of judicial access. First, the common law rule distinguishes between dispositive and non-dispositive motions, while § 107 covers all papers filed in a bankruptcy case. Second, the common law rule gives courts the discretion to create exceptions to the general rule of disclosure to the public. *See, e.g.*, *Times Mirror Co. v. United States*, 873 F.2d 1210, 1218-19 (9th Cir. 1989) (extending exceptions to common law right of access to search warrant materials, at least while pre-indictment investigation is ongoing). By contrast, § 107 has only three exceptions: confidential business information, 11 U.S.C. § 107(b)(1), "scandalous or defamatory matter," *id.* § 107(b)(2), and "means of identification," *id.* § 107(c)(1)(A). Third, the common law rule gives courts discretion to determine whether to protect or disclose documents, while § 107 eliminates a court's discretion by making it man-

datory for a court to protect documents falling into one of the enumerated exceptions. *See* 11 U.S.C. § 107(b) (specifying that "the bankruptcy court *shall*" provide specified protections on "request of a party in interest" (emphasis added)). Because § 107(b) imposes this mandatory requirement, it eliminates the balancing of public and private interests required by the common law rule if a document is scandalous or defamatory. Under § 107, the strength of the public's interest in a particular judicial record is irrelevant; if the exception pertains, the bankruptcy court must issue a protective order on a motion by the affected person or party.

**[14]** Because § 107 speaks directly to and conflicts with significant aspects of the common law right of access, we join our sister circuits in holding that § 107 preempts the common law right of access in bankruptcy proceedings. *See Gitto Global*, 422 F.3d at 7-8 ("Because § 107 speaks directly to the question of public access . . . it supplants the common law for purposes of determining public access to papers filed in a bankruptcy case."); *In re Neal*, 461 F.3d at 1053. Therefore, we conclude that the bankruptcy court correctly held that § 107 supplanted the common law right of access in bankruptcy proceedings.

B

In light of this conclusion, we must now determine whether the bankruptcy court was correct in holding that to invoke the "scandalous" exception to public disclosure in § 107(b), the priests had to show "not only that the materials are likely to cause a reasonable person to alter his or her opinion of the person who is the subject of the materials, but also that they contain material that is either untrue, or potentially untrue and either irrelevant or included in the record for improper purposes." Because this rule is based primarily on *Gitto Global* and *Neal*, we begin with those cases.

In *Gitto Global*, a court-appointed examiner submitted, under seal, an investigative report of fraud by the debtor cor-

poration and corporate officers. 422 F.3d at 5. In response, certain officers claimed that the report was defamatory, and invoked § 107(b) in order to keep the report under seal. *Id.* After determining that § 107 abrogated the common law, and did not merely trigger common law analysis of when the public was entitled to public disclosure, *Gitto Global* concluded that it was "left to the courts to determine the specific contours of the exception" for defamatory material. (The parties did not raise the "scandalous" materials exceptions.) *Id.* at 11. In determining these contours, *Gitto Global* developed the following test: "to implicate § 107(b)(2) in the context of *potentially* untrue material, the information would also have to be [(1)] irrelevant [or (2)] included for improper ends." *Id.* at 14.

The *Gitto Global* court derived this test from a number of different sources. It created the "*potentially* untrue" prong by rejecting as unworkable a test adopted by the bankruptcy court below, whereby the party seeking non-disclosure had to prove the allegedly defamatory material was in fact untrue. *Id.* at 11. *Gitto Global* adopted the "irrelevant" prong from bankruptcy court decisions that had considered the relevance and purpose of material in determining whether the § 107(b) exception applies. *Id.* at 12-13 (citing *In re Commodore Corp.*, 70 B.R. 543 (Bankr. N.D. Ind. 1987); *In re Cont'l Airlines*, 150 B.R. 334 (D. Del. 1993)). Finally, it adopted the "improper ends" prong from another bankruptcy case, *In re Phar-Mor, Inc.*, 191 B.R. 675, 678-80 (Bankr. N.D. Ohio 1995), which in turn had borrowed this test from Rule 12(f) of the Federal Rules of Civil Procedure.[9] As explained in *Gitto Global*, because § 107(b) and Rule 12(f) draw from common historical roots and premises, that is, the protection of parties from the improper use of judicial filings to broadcast scandalous or defamatory material, § 107(b) is applicable

---

[9]Rule 12(f) provides that "the court may strike from any pleading any . . . redundant, immaterial, impertinent, or scandalous matter."

only when a filing is made for an improper purpose. 422 F.3d at 11.

Although *Gitto Global* focused only on the "defamatory" exception in § 107(b), *Neal* relied on it in defining the "scandalous" exception. Thus, *Neal* held that to determine whether the exception applies, a court should consider whether " 'a reasonable person could alter their [sic] opinion' " of the person moving for non-disclosure, 461 F.3d at 1054 (quoting *In re Phar-Mor*, 191 B.R. at 679), and whether the statements were "filed for an improper purpose, such as to gratify public spite or promote public scandal," *id.* (citing *Nixon*, 435 U.S. at 598).

We are not persuaded by either case. Because we have concluded that § 107 displaced the common law right of access to judicial records, and agree that a party's invocation of the exception in § 107(b) does not trigger the common law analysis, there is no basis for incorporating common law concepts derived from *Nixon* (as *Neal* did) or the historical roots and premises underlying equity rules (as in *Gitto Global*). Nor is there anything in § 107 or its legislative history suggesting that Congress intended to interpret the word "scandalous" in § 107(b) in the same manner as courts have interpreted "scandalous" in Rule 12(f), or to adopt any special common law or historical interpretation of the word.[10]

**[15]** Instead of relying on the interpretative aids adopted in *Gitto Global* and *Neal,* we must apply our standard tools of statutory analysis. And "[a]s with any statutory interpretation, we start with the plain meaning of the statute's text." *United States v. Wright*, 625 F.3d 583, 591 (9th Cir. 2010) (internal

---

[10]As one commentator has noted, § 107's legislative history does "little more than parrot the language of the statute." William T. Bodoh & Michelle M. Morgan, *Protective Orders in the Bankruptcy Court: The Congressional Mandate of Bankruptcy Code Section 107 and Its Constitutional Implications*, 24 Hastings Const. L.Q. 67, 76 n.47 (Fall 1996).

quotation marks omitted). As the Supreme Court has reminded us, "courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992). The statute does not define "scandalous," so we turn to its ordinary, dictionary meaning. *See Transwestern Pipeline Co. v. 17.19 Acres of Property Located in Maricopa Cnty.*, 627 F.3d 1268, 1270 (9th Cir. 2010). The Oxford English Dictionary defines "scandalous" as, among other things, "bringing discredit on one's class or position" or "grossly disgraceful." Oxford English Dictionary 575 (2d ed. 2001). Other dictionaries offer similar definitions. *See, e.g.*, Webster's New World College Dictionary 1279 (4th ed. 2005) ("offensive to a sense of decency or shocking to the moral feelings of the community; shameful"). Under ordinary usage, then, matter is "scandalous" if it disgraceful, offensive, shameful and the like. There is no requirement that the material be either "untrue" or "potentially untrue" or that it be irrelevant or included within a court filing for "an improper end." Because the statute is unambiguous, and does not include the glosses provided by *Gitto Global* and *Neal*, our interpretative inquiry is at an end. *See Germain*, 503 U.S. at 254 ("When the words of a statute are unambiguous, then . . . judicial inquiry is complete." (internal quotation marks omitted)). We therefore hold that the party seeking non-disclosure must establish only that the matter is scandalous as that word is commonly understood.

[16] Under the common usage of the word, allegations that a priest has sexually abused children are most assuredly "scandalous" because they bring discredit onto the alleged perpetrators. In light of the mandatory language of § 107(b), the bankruptcy court erred in not granting Fathers M and D's motion to strike the punitive damage estimation memorandum and its attachments.

C

**[17]** Fathers M and D also invoke Rule 26(c) and § 107(b) in requesting redaction of identifying information contained in the deposition transcripts and exhibits.[11] Our ruling here applies equally to the deposition transcripts, so that Fathers M and D's identifying information should be redacted from the depositions filed with the bankruptcy court, and Father D's identifying information (but not Father M's) should be redacted from the depositions that were not so filed.

IV

Rule 26(c) and § 107(b), as we have interpreted them, require courts to use care in determining when documents containing sensitive information affecting a person's privacy interests can be made public over that person's objections. A court must implement the procedure for making such a determination even more carefully when the person objecting to the disclosure was not a party to the proceeding and had limited notice (and, thus, little or no ability to negotiate privacy issues or to challenge the damaging information). Although the public's right of access to documents produced in litigation is long established and has been given great weight from the time of the equity courts in England, courts have likewise given serious consideration to privacy interests of those involved.

**[18]** In sum, we affirm the bankruptcy court's ruling as to the release of discovery documents disclosing Father M's name under Rule 26(c), because the public's serious safety concerns cannot be addressed if Father M's name is redacted. But because the record does not reflect the existence of any similar significant public interest that requires the disclosure

---

[11]Although Appellee Claimants contend that the priests have waived this argument, we may reach this issue for the reasons explained above, *supra* note 6.

of Father D's identifying information, we hold that Father D's identifying information must be redacted from any discovery documents that are released. Finally, because of the mandatory duty to keep scandalous material confidential at the request of a party under § 107(b), we reverse the court's decision to release the punitive damages memorandum and attached documents.[12]

**AFFIRMED in part and REVERSED in part.**

---

[12]Each party shall bear its own costs on appeal.